**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| In Re: ) | |
| ) | |
| I80 Equipment, LLC, ) | |
| ) | |
|     Debtor. ) | |
| _____ ) | |
| ) | |
| Jeana K. Reinbold, Solely as Chapter 7 ) | Case No.: 17-81759 |
| Trustee of the Estate of I80 Equipment, ) | Chapter 7 |
| LLC, ) | |
| ) | |
|     Plaintiff, ) | Adversary No. 19-08110 |
| ) | |
| v. ) | |
| ) | |
| Menard, Inc. ) | |
| ) | |
|     Defendant. ) | |

**DEFENDANT MENARD, INC.'S**
**MEMORANDUM IN SUPPORT OF AMENDED MOTION TO DISMISS**
**FOR FAILURE TO STATE A CLAIM**

NOW COMES Defendant, Menard, Inc. ("Menard"), by and through its attorneys, OTTOSEN DiNOLFO HASENBALG & CASTALDO, LTD., and for its Memorandum of Law in Support of its Amended Motion to Dismiss for Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion"), states as follows:

**I.     INTRODUCTION**

The Trustee's Complaint alleges that I-80 Equipment, LLC ("Debtor") completed 919 transactions at various Menard locations, which violated §§548(a)(1)(A) and (B) of the Bankruptcy Code ("Code"). In Count I, the Trustee alleges actual fraud under Code §548(a)(1)(A), and in Count II, the Trustee alleges

constructive fraud under Code §548(a)(1)(B). Both counts seek avoidance of the transactions and for the entry of judgment against Menard in the amount of $707,322.95, which said amount equals the total value of the transactions. For the reasons more fully set forth below, the Trustee's Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because no plausible set of facts can be pled by the Trustee demonstrating its right to relief against Menard.

## II.   APPLICABLE LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678 "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." *Id.* at 678-679; *citing* FRCP 8(a)(2).

## III.   ARGUMENTS

The Trustee's Complaint contends that all 919 arm's length, retail transactions were fraudulent, and therefore, Menard should be forced to disgorge

$707,322.95 in receipts. However, as is more fully articulated below, the Trustee's arguments are contradicted by state sales-tax law, the Uniform Commercial Code ("UCC"), as well as established case-law. These legal authorities all demonstrate that, contrary to the Trustee's allegations, in exchange for the Debtor's funds, title to the goods purchased passed from Menard to the Debtor as a matter of law, and, again as a matter of law, delivery of the goods purchased was taken by the Debtor. Therefore, the Complaint against Menard should be dismissed.

    **A.**    **Applicable statutory law mandates dismissal.**

The gravamen of the Trustee's claims can be found in paragraphs 17, 18 and 21 of Counts I and II. In paragraphs 17 and 18 of both Counts, the Trustee alleges that fraudulent transfers of the Debtor's funds were made on account of indebtedness and for the benefit of entities related to the Debtor. In paragraph 21 of both Counts, the Trustee alleges the stated "Badges of Fraud" demonstrate the impropriety of the transactions. However, application of the relevant state law governing the sale of goods in a retail transaction, and specifically to the allegations in paragraphs 17, 18 and 21, demonstrates the allegations of the Complaint absolutely fail to state causes of action.

        i.    **The Illinois Retailers Occupation Tax Act ("ROTA") demonstrates dismissal is appropriate.**

In Exhibits A and B of the Trustee's Complaint, the total of each transaction is listed. The Exhibits do not itemize how much of each transaction was for the goods themselves or how much was for applicable sales-tax, but since Menard holds itself out as a retailer, and habitually engages in selling tangible personal

property at retail, transactions occurring at Menard are subject to ROTA. 35 ILCS 120/1.

In *People ex rel. Lindblom v. Sears Brands, LLC,* the First District Appellate Court of Illinois explained Illinois' taxing scheme:

In Illinois, the Retailers' Occupation Tax Act (ROTA) (35 ILCS 120/1 *et seq.* (West 2014)) and the Use Tax Act (35 ILCS 105/1 *et seq.* (West 2014) ) are complementary, interlinking statutes comprising the taxation scheme commonly referred to as the sales tax. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 362, 336 Ill.Dec. 1, 919 N.E.2d 926 (2009). The ROTA imposes a tax on retailers selling tangible personal property to purchasers and is this State's primary means of taxing the retail sale of tangible personal property. *Id.*; *Irwin Industrial Tool Co. v. Department of Revenue*, 238 Ill. 2d 332, 340, 345 Ill.Dec. 20, 938 N.E.2d 459 (2010). The Use Tax Act (35 ILCS 105/3 (West 2014)) imposes a tax upon consumers for the privilege of using in Illinois tangible personal property purchased at retail from a retailer. *Kean*, 235 Ill. 2d at 362, 336 Ill.Dec. 1, 919 N.E.2d 926. A retailer's tax liability under the ROTA is computed as a percentage of "gross receipts" (35 ILCS 120/2-10 (West 2014)), defined as the "total selling price" (*id.* § 1). *Kean*, 235 Ill. 2d at 362, 336 Ill.Dec. 1, 919 N.E.2d 926. Likewise, the use tax is computed as a percentage of the "selling price." *Id.* An identical tax rate of 6.25% is imposed under the ROTA (35 ILCS 120/2-10 (West 2014) ) and the Use Tax Act (35 ILCS 105/3-10 (West 2014) ). *Kean*, 235 Ill. 2d at 362-63, 336 Ill.Dec. 1, 919 N.E.2d 926; *Irwin Industrial Tool Co.*, 238 Ill. 2d at 340, 345 Ill.Dec. 20, 938 N.E.2d 459."

A retailer selling tangible personal property is responsible for remitting the retailers' occupation tax to the Department of Revenue, but a retailer may reimburse itself for that tax liability by collecting tax from purchasers for using that property within the state, which is commonly known as the "sales tax" on the purchase of tangible personal property. *Nava v. Sears, Roebuck & Co.*, 2013 IL App (1st) 122063, ¶ 14. Even though a single sale and purchase of tangible personal property at retail triggers the imposition of both the use tax (for use of the property) and retailers' occupation tax (for selling the property), the retailer is

responsible for remitting only one payment to the Department and that single payment satisfies both tax obligations. *Id.*

Under the ROTA, then, a tax is imposed when a retailer such as Menard completes a "sale at retail." *Id.*; 35 ILCS 120/1. Section 35 ILCS 120/1 defines a "sale at retail" as "any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use or consumption, and not for the purpose of resale." That same section defines a "purchaser" as anyone who, through a sale at retail, acquires the ownership of or title to tangible personal property for a valuable consideration. *Id.* Under this statutory scheme, tax cannot be triggered until title passes, and the tax generated is paid by the person to whom title passes.

In this case, the ROTA requires the conclusion that title passed to the Debtor.  On the one hand, the Complaint admits, as it must, that the Debtor provided the valuable consideration to Menard.  Under the ROTA, the person providing the consideration takes title to the goods purchased.  *Id.*  On the other hand, Menard was legally incapable of transferring ownership of the goods purchased to any entity other than the Debtor, since the Debtor paid Menard the valuable consideration.  This is true even if the goods acquired by the Debtor ended up in other hands.

Under the ROTA, a "sale at retail" includes "any transfer of the ownership of or title to tangible personal property to a purchaser, for use or consumption by any *other* person to whom such purchaser may transfer the tangible personal property without a valuable consideration." 35 ILCS 120/1 (emphasis added). If the

Trustee's argument is that a fraudulent transfer occurred because third party (Jones and his related entities) directly took title to the goods that Debtor paid for (i.e. Debtor purchased the goods for the benefit of third parties), the ROTA negates this argument. "Even where a plaintiff has alleged the existence of a broad, fraudulent scheme, 'the [c]ourt must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of [an actually fraudulent transfer]." *In re DBSI Inc.*, 593 B.R. 795, 822 (2018) (quoting, *Bayou Superfund, LLC v. WAM Long/Short Fund II, LP* (*In re Bayou Grp., LLC*), 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007). Having paid its money (including sales tax) and received title to the goods in question, as a matter of state law, the transaction between Menard and the Debtor was complete. Any subsequent transfers by the Debtor do not make the transactions with Menard fraudulent. Consequently, the Trustee's allegations simply do not hold up to legal scrutiny, and the Complaint should be dismissed. There cannot be actual or constructive fraud under §548.

    **ii.**  **The UCC also renders the Complaint legally insufficient.**

In both Illinois and Iowa, the situs of the complained-of transactions, the UCC governs the sale of goods. See 810 ILCS 5/2-102 and ICA §554.2102. To determine when, for tax purposes, title to property is transferred, Illinois courts apply the "title passing tests" contained in the UCC. *Continental Illinois Leasing Corp. v. Department of Revenue*, 108 Ill.App.3d 583, 587, 439 N.E.2d 118, 64 Ill.Dec. 189 (1982). Pursuant to §2-105 of the UCC, the term "goods" means "all things, including specially manufactured goods, which are movable at the time of

identification to the contract for sale . . ." There is little doubt that the items purchased by the Debtor at Menard constitute "goods" as defined in the UCC. Furthermore, under §2-103 of the UCC, a "Buyer" is defined as "a person who buys or contracts to buy goods," while the term "Seller" means a person who sells or contracts to sell goods.  It follows that a "sale" under the UCC consists in the "passing of title from the seller to the buyer for a price." 810 ILCS 5/2-106. Since, as the Complaint admits, the price was paid by the Debtor, the Debtor must be considered the buyer under the UCC.

Under §§2-401(1) and (2) of the UCC, unless the agreement between the buyer and seller explicitly provides otherwise (and nothing in the Trustee's Complaint indicates it did), title to goods identified to the contract passes to the buyer at the time and place at which the seller completes physical delivery of the goods. 810 ILCS 5/2-401. Delivery occurs, in turn, when, the seller puts and holds conforming goods at the buyer's disposition and gives the buyer any notification reasonably necessary to enable him to take delivery. 805 ILCS 5/2-503. Stated differently, under the UCC, unless otherwise "explicitly" agreed, title passes to the buyer at the time and place at which the seller completes his performance. *In re Henning*, 69 B.R. 348, 350 (1987). In this case, the only conclusion that can be derived from the Trustee's Complaint is that when the Debtor paid for the goods at the Menard checkout counter, title to those goods passed to the Debtor, and the Debtor became the owner of such goods as a matter of law. The Trustee's allegations that the goods purchased were enjoyed by one or more related entities, that the consideration received by the Debtor was inadequate, or that the Debtor

was insolvent as a result of these transactions is simply not supported by applicable law. In all instances, the Debtor walked out of Menard the owner of the goods purchased, with an estate equally as large as when the Debtor went in. There was simply nothing fraudulent about these transactions.

Caselaw applying the UCC to retail transactions further demonstrates the fallacies in the Complaint. In *In re Cohen*, the United States Bankruptcy Appellate Panel of the Ninth Circuit relied on the UCC to determine the propriety of certain complained-of automobile transactions the trustee alleged to be violative of §§548(a)(1)(A) and (a)(1)(B) of the Code. 199 B.R. 709 (9th Cir. 1996). In furtherance of a Ponzi scheme, the debtor bought luxury automobiles at retail from two merchants, and the debtor directed the merchants where to deliver the automobiles. After the Ponzi scheme collapsed, the bankruptcy trustee brought fraudulent transfer actions against the merchants under Code §548. *Id.* at 712.

Applying the UCC, the Court began its discussion noting that a "'sale' is the 'passing of title from the seller to the buyer for a price.'"[1] The Court continued, stating that "[i]n the absence of explicit agreement, title passes to the buyer when and where 'the seller completed his performance with reference to the physical delivery of the goods.'" *Id.* at 714. Although the Court ultimately found the subject debtor to have the requisite intent to have violated §548(a)(1)(A), the Court clearly indicated that ordinary retail transactions cannot be fraudulent without much deeper inquiry:

---

[1] California has adopted the Uniform Commercial Code. Section 2-106 of the Uniform Commercial Code reads in the same fashion as Cal.Comm.Code S 2106 – ". . . A 'sale' consists in the passing of title from the seller to the buyer for a price . . ."

> Logic and equity require that ordinary market-price sales by retail merchants acting in good faith not be contorted beyond commercial practice for the purpose of expanding the merchant's status as a captive risk taker. Routine commercial practice has retail merchants selling goods to one individual and delivering them to, or holding them for pick-up by, another individual. So long as a merchant has no reason to suspect the customer's Ponzi scheme or other skullduggery, sales made under ordinary commercial terms should be viewed as transactions between merchant and customer. Whether such a sale is avoidable in a manner that exposes the merchant to liability should depend upon the substantive merits of the merchant-customer transaction, not on some artificiality of form.

*Id.* at 715.

*Cohen* clearly states that a merchant's liability should depend upon the substantive merits of the "merchant-customer transaction." *Id.* In applying *Cohen* here, there is nothing pled by the Trustee concerning the substance of the Debtor's transactions at Menard. Aside from the bald assertions made in paragraphs 17, 18 and 21 of each count of the Complaint, the Trustee has not pled anything demonstrating Menard had any reason to suspect the Debtor's "skullduggery." The sales the Trustee complains of here should be viewed as ordinary, market-price sales between merchant and customer, which, without significantly more information, cannot alone constitute fraudulent transfers as the Trustee would have this Court believe.

Under the UCC and interpretive caselaw, title passes to a purchaser of goods once the seller delivers the identified goods. The UCC does not consider what the purchaser does with the goods after the purchase is complete. When an agent or representative of the Debtor walked out of Menard with the goods purchased in each of the 919 retail transactions identified in the Trustee's Complaint, the Debtor was the owner of said goods. The Trustee's allegations in

paragraph 17, 18 and 21 are irrelevant and only "hold water" if the unequivocal language of the UCC is ignored. Because the UCC dictates that the Debtor acquired title to the goods purchased, and therefore, received value in its exchanges with Menard, the Trustee cannot, as a matter of law plead otherwise. As such, the Complaint must be dismissed.

### B.     Relevant caselaw demonstrates the fallacies in the Complaint.

The Trustee's Complaint contends that Menard is liable to the Trustee for $707,322.95 because the transactions complained of were either actually or constructively fraudulent. Relevant case-law dictates that no fraud – actual or constructive – was involved in the complained-of transactions.

In *In re Think Retail Solutions, LLC* ("*TRS*"), the United States Bankruptcy Court for the Northern District of Georgia was presented with a set of facts nearly identical to that of the instant case. 2019 WL 2912717 (2019). Instead of the purchase of consumer goods at Menard, *TRS* involved the purchase of airline tickets from Delta Air Lines, Inc. ("Delta"). On March 30, 2017, the Chapter 7 trustee of the bankruptcy estates of TRS and its principal, Tammy Simpson ("Simpson"), filed a complaint against Delta for recovery of fraudulent transfers and unjust enrichment. The transfers at issue were the purchase of airline tickets from Delta for Simpson, her friends and family, totaling $181,336.63. *Id.* at 1.

To purchase the tickets from Delta, Simpson and TRS used TRS's debit card, Simpson's debit card, and two credit cards issued to Simpson that were paid by TRS. *Id.* at 4. Delta did not inquire into the purpose for which the tickets were intended or ultimately used or the financial condition of the passengers associated

with the tickets or the cardholders associated with the debit and credit transactions. Moreover, Delta did not know Simpson was allegedly using corporate funds to pay for her personal gambling trips. *Id.* at 9.

In discussing the Trustee's claim in respect of §548(a)(1)(A), the Court noted there was no dispute whether the payments made by TRS and Simpson constituted transfers of an interest of property. *Id.* at 12. In regard to the §548(a)(1)(A) claim, the Court had to determine whether the Trustee established the requisite intent. In reviewing the circumstances surrounding the subject transfers, the Court found the relationship between the transferor – TRS and/or Simpson – and the transferee – Delta – to be of paramount importance. *Id.* at 13. Delta pointed out that, as the transferee, none of the transfers were made to an insider of TRS or Simpson. Although the tickets were ultimately given to, and used by, Simpson, her friends and her family, the transfers at issue were between her, and/or TRS, and Delta. The Court determined that it was "undisputed that the tickets were purchased in arms-length transactions." *Id.*

The Trustee contended the transfers were made for "inadequate or no consideration because neither TRS nor Simpson received objective value for tickets purchased. . ." *Id.* at 14. In response to this contention, the Court looked at the Eleventh Circuit's ruling in *McHenry v. Dillworth*, wherein the Eleventh Circuit stated that "under § 548, in assessing the 'value' of property, goods, or services provided directly to a debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or services provided had objective value." *McHenry v. Dillworth*

*(In re Caribbean Fuels Am., Inc.)*, 688 F. App'x 890, 894-95 (11th Cir. 2017). *Id.* The Court stated that there was no question Delta provided airline tickets at fair market value in exchange for funds received. Moreover, the Court stated that the payments made to purchase the airline tickets consumed substantially all of TRS's or Simpson's assets. Furthermore, "the nature of airline tickets as a consumable undermines any suggestion that the transfers were a sham to put the money out of reach of creditors while the Debtors maintained control of the underlying asset." *Id.* In concluding its discussion on the §548(a)(1)(A) claim, the Court stated, "[h]ere, Simpson purchased services, and the services were provided. Perhaps her spending was irresponsible in light of her debts, but poor judgment is not necessarily indicative of intent to hinder, delay, or defraud."

With respect to §548(a)(1)(B), the Court noted that an essential element to a constructive fraud claim is that the Trustee must plead the debtor received less than reasonably equivalent value in exchange for the complained-of transfer(s). *Id.* at 15. The Court noted that the Code defines "value" in §548(d)(2) as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." *Id.* The Trustee argued that TRS and Simpson did not receive any value from the tickets purchased from Delta because the tickets were used by Simpson and other individuals to go on gambling trips, which could not benefit TRS or Simpson. *Id.* at 17. Delta countered arguing that, at the time of the transfers, TRS and/or Simpson received value in the form of a seat on an airplane, along

with the ability to change various aspects of the ticket, including the identity of the individual traveling on the ticket and the destination. *Id.*

Application of *TRS* to the instant case demonstrates that the Complaint should be dismissed for failure to state a claim because the transfers at issue cannot be considered fraudulent as a matter of law. Here, as in *TRS*, the Complaint concerns arm's length transactions where the Debtor transferred property and received value. The only difference being that TRS concerned the purchase of airline tickets for Simpson, her family and friends, while here, the Debtor purchased consumer goods and then transferred them to insiders or related entities.

If the Debtor did not purchase the consumer goods bought in the 919 transactions referenced in the Complaint, then another member of the public would have purchased those same goods, in exactly similar retail transactions, for the exact same prices as the Debtor. Moreover, it is not Menard's customary practice to question its customers on the nature of their purchases in similar fashion to how Delta does not inquire about the circumstances surrounding the purchase of a plane ticket. The transactions complained of in the instant case were arm's length transactions similar to those transactions complained of in *TRS*, which the Court conclusively determined could not be fraudulent. This Court must find that the Complaint fails to complain of actually fraudulent transactions under §548(a)(1)(A) and dismiss count I of the Complaint.

As to Count II of the Complaint, alleging constructive fraud under §548(a)(1)(B), the Complaint must be dismissed for failure to state a claim because the Trustee cannot, in good faith, contend that the complained-of transactions did

not involve the exchange of reasonably equivalent value. Each transaction was an arm's length transaction, and, it is undisputed that if the Debtor had not purchased the goods, then Menard would have offered and sold the goods to another member of the public at a prevailing market price. Accordingly, because the Trustee cannot plead a plausible set of facts demonstrating that the Debtor received less than reasonably equivalent value, Count II should also be dismissed.

## IV.   CONCLUSION

Both counts of the Complaint are deficient, and therefore, should be dismissed. The UCC, applicable sales-tax law and relevant case-law conclusively demonstrate the complained-of transactions were not fraudulent. All 919 transactions were arm's length transactions involving the transfer of value from Menard to the Debtor. The Debtor became the owner of the goods purchased, and therefore, received reasonably equivalent value for the money paid to Menard.

WHEREFORE, Defendant, Menard, Inc., respectfully requests that this Honorable Court enter an order dismissing the Trustee's Complaint with prejudice, award Menard its costs of suit, and for such further and additional relief as this Honorable Court deems just and necessary in the premises.

Respectfully Submitted,

**OTTOSEN DiNOLFO HASENBALG & CASTALDO, LTD.**

_____

One of Its Attorneys

Craig D. Hasenbalg (chasenbalg@ottosenlaw.com)
W. Anthony Andrews (wandrews@ottosenlaw.com)
Joshua B. Rosenzweig (jrosenzweig@ottosenlaw.com)
**OTTOSEN DiNOLFO HASENBALG & CASTALDO, LTD.**

1804 N. Naper Blvd., Ste. 350
Naperville, IL 60563
Phone: (630) 682-0085

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 15th day of May, 2020, a copy of the foregoing was filed and thereafter served using the Court's electronic filing system on the following counsel of record for the Plaintiff:

Andrew W. Covey
Acovey1@hotmail.com

Jeana K. Reinbold
jeana@jeanareinboldlaw.com


                                                */s/ Joshua B. Rosenzweig*
                                                 Joshua B. Rosenzweig