## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In re:<br>I80 Equipment, LLC<br><br>      Debtor(s). | Case No. 17-81749<br><br>Chapter 7 |
| Jeana K. Reinbold, solely as Chapter 7 Trustee of<br>the Estate of I80 Equipment, LLC<br><br>      Plaintiff,<br><br>v.<br><br>Menard, Inc.<br><br>      Defendant. | AP. No.  19-8110 |

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES Jeana K. Reinbold, solely as Chapter 7 Trustee of the Estate of I80 Equipment, LLC ("Plaintiff") and, pursuant to Fed. R. Bankr. P. 7056, for her Motion for Partial Summary Judgment in her favor and against Defendant Menard, Inc. ("Defendant") denying Defendant's Second, Third and Fourth Amended Affirmative Defenses, states as follows:

### I.  INTRODUCTION

I80 Equipment, LLC ("Debtor") was an Illinois limited liability company formed June 14, 2007. The sole member and manager of Debtor was Erik R. Jones ("Jones"). Debtor's business was to purchase, refurbish, sell and service bucket trucks. Debtor filed a chapter 7 case on December 6, 2017.

Jones Lease Properties, LLC ("JL") is an Illinois limited liability company formed January 21, 2004. Jones is the sole member and officer of JL. JL's business from 2015 to 2017 was renting real estate.

J.P. Rentals, LLC ("JP") was an Illinois limited liability company formed March 13, 2008. Jones

was also the sole member and officer of JP. JP was also in the real estate rental business from 2015 to 2017.

Plaintiff filed a Complaint against Defendant alleging that, within 2 years of filing bankruptcy, Debtor transferred $707,322.95 of its funds to or for the benefit of Defendant. Plaintiff sought to avoid and recover such transfers as actual and constructively fraudulent conveyances pursuant to 11 U.S.C. §§ 548 and 550.

Defendant answered and subsequently filed Amended Affirmative Defenses. The Second Amended Defense raises the doctrine of judicial estoppel. Plaintiff believes this defense is legally insufficient because none of the elements of judicial estoppel are present in this proceeding.

Defendant's Third Amended Affirmative Defense maintains that Defendant is a subsequent transferee and is thus entitled to the raise Bankruptcy Code Section 550(b)(1) as a defense. Plaintiff believes this defense is legally insufficient under the "majority approach" because the funds in issue passed directly from Debtor to Defendant. In addition, even if this Court adopted the "minority approach," Defendant would still be the initial transferee.

Defendant's Fourth Amended Affirmative Defense alleges Plaintiff's Complaint fails to state a claim upon which relief can be granted. Plaintiff believes this defense is legally insufficient because the proper method to raise this defense is by motion, which Defendant has already done twice unsuccessfully.

Defendant requests that this Court enter partial summary judgment in her favor and against Defendant denying Defendant's Second, Third and Fourth Amended Affirmative Defenses.

## II. UNDISPUTED MATERIAL FACTS

1. Debtor was an Illinois limited liability company formed June 14, 2007. (Pretrial

Statement, p. 5, ¶ 7) (Ex. A).

2.      Debtor's business was to purchase, refurbish, sell and service bucket trucks. (David M.

Ciasto ("Ciasto") 12/8/22 Dep. pp. 29-30, 36-37) (Ex. B).

3.      JL is an Illinois limited liability company formed January 21, 2004. (Pretrial Statement,

p. 5, ¶ 8) (Ex. A).

4.      JL's business from 2015 to 2017 was renting real estate. (Ciasto 5/18/23 Dep. pp. 17-18)

(Ex. C).

5.      JP was an Illinois limited liability company formed March 13, 2008. (Pretrial Statement,

p. 6, ¶ 9) (Ex. A).

6.      JP was also in the real estate rental business from 2015 to 2017. (Ciasto 5/18/23 Dep. pp.

18-19) (Ex. C).

7.      From 2015 through 2017, Jones was the sole owner/member and sole officer/manager of

Debtor, JL and JP. (Ciasto 12/8/22 Dep. pp.  28, 30-32, 36, 38-39, 118) (Ex. B).

8.      Debtor filed a chapter 7 case herein on December 6, 2017. (Pretrial Statement, p. 5. ¶  6)

(Ex. A).

9.      Plaintiff filed her Complaint herein on December 5, 2019, which Complaint sought to

avoid and recover $707,322.95 of fraudulent transfers made by Debtor to or for the benefit of Defendant

within two (2) years of filing bankruptcy. (Ex. D).

10.     Defendant filed its Answer to Plaintiff's Complaint herein on September 22, 2020. (Ex.

E).

11.     In Answer to ¶16 of the Complaint, Defendant stated:

Defendant admits that Debtor paid Defendant by credit card, debit and/or check for goods purchased at its retail stores within two years of Debtor's bankruptcy. (Ex. E).

12.     In the Pretrial Statement, Defendant stipulated as follows:

10.  Within two (2) years of bankruptcy, Debtor transferred $707,322.95 of its funds, net of refunds, to Defendant by credit card, debit and/or check. The dates and amounts of such transfers are set forth on Exhibits "A" through "C" attached to Plaintiff's Complaint filed herein (Court Docs. 1-1, 1-2 and 1-3). (Pretrial Statement, p. 6, ¶ 10) (Ex. A).

13.     Defendant filed its Amended Affirmative Defenses herein on May 3, 2022. (Ex. "F").

14.     The goods were purchased at Defendant's locations in Illinois and Iowa. (Amended Affirmative Defenses, p. 2, ¶ 6) (Ex. F).

15.     Plaintiff filed her Reply to Defendant's Amended Affirmative Defenses herein on May 17, 2022. (Ex. G).

16.     JL filed a chapter 11 case in the United States Bankruptcy Court for the Southern District of Iowa on November 26, 2018, which was designated case number 18-02568. (Ex. H). On January 4, 2019 venue of this case was transferred to this Court where it was designated as case number 19-80014 ("JL Case"). (Ex. I).

17.     On January 31, 2019, Plaintiff filed Claim 5-1 on behalf of Debtor's bankruptcy estate against JL's bankruptcy estate for $2,000,000.00 ("Claim 5-1"). Claim 5-1 stated the basis of the claim was "Estimated claim for funds transferred from I80 – See Attachment A." (Claim 5-1, p. 2, ¶ 8) (Ex. J).

18.     Attachment A to Claim 5-1 provided, in part:

This Proof of Claim is based on amounts transferred from I80 Equipment, LLC ("I80") to Jones Lease Properties, LLC, JP Rentals, LLC and JP Apartments Cooperative (collectively, "Jones Companies") prior to the

4

time I80 filed chapter 7 bankruptcy on December 6, 2017 . . . This claim is estimated to be between $1.5 and $2mm, and is filed by the chapter 7 bankruptcy trustee of the I80 case . . . against each of the Jones Companies, reserving all rights as set forth herein.  To date, the I80 Trustee has been unable to calculate and allocate the exact amount owed by each of the Jones Companies to I80 due to the lack of books and records, but the Claimant expressly reserves all rights to amend each claim as further information becomes available . . .

<u>Reservation of Rights</u>

1.      The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies, waiver of any past, present or future defaults or events of default, or a waiver or limitation of any rights, remedies, or interest of Claimant.

2.      Claimant reserves all rights accruing to it at law, in equity, and otherwise, including, without limitation, its rights and claims against . . . all other parties.

3.      Claimant expressly reserves its rights, remedies, liens, interests, priorities, protections and claims against Debtor and each of its respective creditors, under Bankruptcy Code sections . . . 548 . . . or 550 . . . and the right and benefit at law or in equity of all the rights and interests under and with respect to the claims.

4.      There may be additional documents in the possession or under the control of Debtor that would further support the claims hereunder.  Claimant expressly reserves her right to supplement the foregoing Proof of Claim against Debtor and any of its affiliates after full disclosure of all relevant facts in these bankruptcy proceedings, whether pursuant to Bankruptcy Code sections 1104 or 1006, or such adversary actions or other legal proceedings as may be necessary or appropriate.

5.      Claimant reserves the right to amend, supplement or recharacterize this Proof of Claim or to file additional proofs of claim for additional claims . . .and all other claims, at law or in equity, arising prior to, on, or after the petition date of November 26, 2018 for each of the Jones Companies. Claimant reserves the right to amend or supplement this Proof of Claim, if Claimant should deem it necessary and appropriate, for any reason including an updated statement of the amount then due, or for any other purpose for which a Proof of Claim filed in this proceeding could be amended. (Claim 5-1, pp. 4-5) (Ex. J).

Case 19-08110    Doc 83    Filed 11/22/23    Entered 11/22/23 14:44:57    Desc Main
Document      Page 6 of 21

19.    JL filed an objection to Claim 5-1 in the JL Case on June 3, 2019. (Ex. K).

20.    On July 31, 2019, Plaintiff filed Amended Claim 5-2 in the JL Case in the amount of

$5,419,440.62. ("Claim 5-2") (Ex. L).

21.    Attachment A to Claim 5-2 stated, in part:

This Proof of Claim is based on amounts transferred from I80 Equipment, LLC ("I80") to
Jones Lease Properties, LLC ("Jones Lease") prior to the time I80 filed chapter 7
bankruptcy .  .  .

In Proof of Claim 5 . . . the amount owed . . . was estimated to be between $1.5 and
$2mm, reserving all rights as set forth herein.

The I80 Trustee has since secured records which were formerly maintained by I80 but not
voluntarily provided by Erik Jones, which show that the net amount owed by Jones Lease
to I80 is approximately $968,679.58, as set forth in <u>Attachment B</u> . . .

As reflected in <u>Attachment B</u>, between July 1, 2015 and December 6, 2017,
approximately $5,419,440.62 of I80's funds were utilized to purchase real estate and
other assets for Jones Lease and pay other costs of Jones Lease which constitute
gratuitous transfers that were not supported by consideration . . .

Reserving all rights as set forth in this Proof of Claim accordingly, the I80 Trustee hereby
asserts a claim for all amounts transferred and asserts that all assets of Jones Lease are
held in resulting or constructive trust for the I80 bankruptcy estate. (Ex. L).

22.    Attachment B to Claim 5-2 (pp. 6-145) included the transfers made by Debtor to

Defendant which are the subject of this adversary proceeding. (Ex. L).

23.    On November 13, 2019, this Court entered an order holding that JL's objection to Claim

5-1 was moot. (Ex. M).

24.    On August 28, 2020, Plaintiff and JL filed a  Joint Motion to Approve Compromise in the

JL Case ("Motion") to which a Settlement and Release Agreement executed by Plaintiff, JL, JP, Jones

and other companies owned and/or managed by Jones, i.e., Jones Holdings, LLC ("Jones Holdings"),

Pyramid Systems, L.L.C. ("Pyramid') and J.P. Apartments Cooperative, was attached as Ex. A

("Settlement Agreement"). The Motion and Settlement Agreement were also filed in this case. (Ex. N).

25.     The Settlement Agreement provided in part that in return for a payment of $125,000.00 to

Plaintiff, Claim 5-2 would be ordered withdrawn with prejudice, adversary proceedings filed by Plaintiff

against JL, Jones, Jones Holdings and Pyramid would be dismissed with prejudice and a default

judgment entered in favor of Plaintiff and against JP would be released. (Settlement Agreement, ¶ 2(a)-

2(c)) (Ex. N).

26.     On September 25, 2020, this Court entered an Order in both the JL Case and this case

granting the Motion and approving the Settlement Agreement. (Ex. O).

27.     The Plaintiff received the $125,000.00 on September 29, 2020 (Ex. P, ¶ 6), whereupon a

Stipulated Order was entered in the JL Case on October 13, 2020 withdrawing Claim 5-2 with prejudice.

(Ex. Q).  The other adversary proceedings against the named parties were also dismissed with prejudice

and the default judgment was released. (Ex. P, ¶ 6).

28.     No part of the $125,000.00 was applied to the amounts claimed to be owed by Defendant

to Plaintiff in this adversary proceeding. (Ex. P, ¶ 7).

29.     Ciasto was an independent contractor for Debtor from 2014 through 2017 or 2019. His

duties including helping with bookkeeping, quality assurance and operations and doing tax returns.

(Ciasto 12/8/22 Dep. pp. 13-15) (Ex. B).

30.     Mitch Melega was the Debtor's controller from 2015 through the rest of the time Ciasto

was affiliated with Debtor as an independent contractor. (Ciasto 12/8/22 Dep. pp. 32-33) (Ex. B).

31.     Lois Estabrook was an accountant and worked for Debtor for years and also did the

books for JP and JL for a time. (Ciasto 12/8/22 Dep. pp. 19, 223.) (Ex. B).

32.      Before someone could use Debtor's credit card, they had to get permission. If they were going to buy something for repair at a house or whatever they would have to get permission from Jones or maybe Lois Estabrook or Mitch Melega. (Ciasto 12/8/22 Dep., p. 93) (Ex. B) (Ciasto 5/18/23 Dep. pp. 175-176) (Ex. C).

33.      Defendant filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and Memorandum on March 4, 2020 (Ex R-S) as well as an Amended Motion to Dismiss under this Rule and Memorandum on May 15, 2020 (Ex. T-U), all of which cited *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). Both Motions were denied on September 1, 2020. (Ex. V-W).

## IIL ARGUMENT

Fed. R. Bankr. P. 7056(a) provides, in part:

> A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Summary judgment may be appropriate for affirmative defenses, as well as claims. *IPOX Schuster, LLC v. Nikko Asset Management Co., Ltd.,* 304 F.Supp.3d 746, 772 (N.D.Ill. 2018).

A.      <u>Defendant's Second Amended Affirmative Defense is legally insufficient because none of the elements of judicial estoppel are present in this proceeding.</u>

Defendant alleges that, while Claims 5-1 and 5-2 state that funds were transferred from Debtor *to* JL, Plaintiff is now claiming that the *same* funds were transferred from Debtor *directly to* Defendant (emphasis in original). Defendant asserts Plaintiff should be estopped from making a claim against Defendant under the doctrine of judicial estoppel, citing *Moy v. Ng,* 371 Ill.App.3d 957, 962 (1st Dist. 2007).

Federal law, not Illinois state law, concerning judicial estoppel applies to this proceeding. *Ogden*

*Martin Systems of Indianapolis, Inc. v. Whiting Corp.,* 179 F.3d 523, 527 and fn. 1 (7th Cir. 1999). As

the Supreme Court noted:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in
> maintaining that position, he may not thereafter, simply because his interests have
> changed, assume a contrary position, especially if it be to the prejudice of the party who
> has acquiesced in the position formerly taken by him." . . . This rule, known as judicial
> estoppel, "generally prevents a party from prevailing in one phase of a case on an
> argument and then relying on a contradictory argument to prevail in another phase." . . .
>
> Although we have not had occasion to discuss the doctrine elaborately, other courts have
> uniformly recognized that its purpose is "to protect the integrity of the judicial process,"
> . . . by "prohibiting parties from deliberately changing positions according to the
> exigencies of the moment," . . . "Judicial estoppel is a doctrine intended to prevent the
> perversion of the judicial process." . . . judicial estoppel prevents parties from "playing
> 'fast and loose with the courts' " . . . Because the rule is intended to prevent "improper
> use of judicial machinery," judicial estoppel "is an equitable doctrine invoked by a court
> at its discretion," . . .
>
> Courts have observed that "[t]he circumstances under which judicial estoppel may
> appropriately be invoked are probably not reducible to any general formulation of
> principle," . . . Nevertheless, several factors typically inform the decision whether to
> apply the doctrine in a particular case: First, a party's later position must be "clearly
> inconsistent" with its earlier position . . . Second, courts regularly inquire whether the
> party has succeeded in persuading a court to accept that party's earlier position, so that
> judicial acceptance of an inconsistent position in a later proceeding would create "the
> perception that either the first or the second court was misled," . . . Absent success in a
> prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent
> court determinations," . . . and thus poses little threat to judicial integrity. . . A third
> consideration is whether the party seeking to assert an inconsistent position would derive
> an unfair advantage or impose an unfair detriment on the opposing party if not estopped.
> *New Hampshire v. Maine,* 532 U.S. 742, 749–51, 121 S. Ct. 1808, 1814–15, 149 L. Ed.
> 2d 968 (2001) (citations omitted).

None of the above elements are present here.

Nothing in this adversary proceeding is inconsistent with Claim 5-1. While Claim 5-1 did state

that it was based on amounts transferred to JL (as well as JP and JP Apartments Cooperative), it also

stated that (1) it was an estimated claim; (2) Plaintiff had been unable to calculate the exact amount

owed by each company due to the lack of books and records and reserved the right to amend each claim as further information became available; (2) the Proof of Claim was not intended as an election of remedies or a waiver or limitation of any of Plaintiff rights, remedies or interests and (4) Plaintiff reserved all rights against "underlined all other parties." (emphasis added). Claim 5-1 was filed early in the JL case and represented a preliminary best effort by Plaintiff to assert her claim before records became available. See *Help At Home Inc. v. Medical Capital, L.L.C.,* 260 F.3d 748, 753 (7th Cir. 2001).

Claim 5-1 was later amended by Claim 5-2. An amended proof of claim supersedes the original filing and deprives the earlier filing of legal effect. *Matter of Vitro Asset Corporation,* 656 Fed.Appx. 717, 722 and n.1 (5th Cir. 2016). Claim 5-2 rendered Claim 5-1 moot. In recognition of this, after Claim 5-2 was filed this Court entered an order holding JL's objection to Claim 5-1 to be moot.

While Claim 5-2, like Claim 5-1, initially stated it was based on amounts transferred from Debtor to JL, it later stated that Plaintiff had secured additional records and that Attachment B reflected that "approximately $5,419,440.62 of I80's funds were utilized to purchase real estate and other assets for Jones Lease and pay other costs of Jones Lease . . ." (emphasis added). Attachment B then sets forth not only the transfers made directly to Menards which are at issue in this proceeding, but also funds transferred directly to JL and to other vendors for the benefit of JL.

Plaintiff's position taken in Claim 5-2 is thus entirely consistent with her position taken in this proceeding, as Claim 5-2 included payments to Defendant for the benefit of JL that are being pursued in this proceeding. This is entirely proper. Under Bankruptcy Code Sections 550(a)(1) and 550(d), a trustee may recover an avoided transfer from the initial transferee (Defendant) or the entity for whose benefit such transfer was made (JL), subject to the limitation that a trustee is entitled to only a single satisfaction. 11 U.S.C. §§ 550(a)(1) and (d).

10

Nor is Plaintiff seeking a "duplicate benefit" or double satisfaction.  The Settlement Agreement provided Plaintiff would be paid $125,000.00 in satisfaction not only of Claim 5-2 (which totaled $5,419,440.62), but also of claims asserted in adversary proceedings filed by Plaintiff against JL, Jones, JP, Pyramid, and Jones Holdings. No part of the $125,000.00 was applied to the amounts claimed to be owed by Defendant to Plaintiff in this adversary proceeding. Plaintiff thus has not already recovered all or any portion of the $707,322.95 which she seeks to recover here. Plaintiff will not receive an unfair advantage or impose an unfair detriment on Defendant if not estopped. Further, Defendant at no point acquiesced to its prejudice in the position taken by Plaintiff in Claim 5-2.

Finally, Plaintiff did not persuade this Court to accept Plaintiff's position set forth in Claim 5-2. This Court only granted the Motion and approved the Settlement Agreement, whereupon Claim 5-2 was ordered withdrawn with prejudice. This Court never determined whether all or any portion of Claim 5-2 should be allowed. There is thus no risk of "inconsistent court determinations" or any "threat to judicial integrity."

The Second Amended Affirmative Defense is insufficient as a matter of law.

B.    <u>Under the majority approach, Defendant's Third Amended Affirmative Defense under Bankruptcy Code Section 550(b)(1) is legally insufficient because the funds passed directly from Debtor to Defendant.</u>

Once a transfer is avoided, the trustee may recover from either the initial transferee, the entity for whose benefit the transfer was made, or any immediate or mediate (i.e., subsequent) transferee of the initial transferee. 11 U.S.C. § 550(a). The trustee's right to recover from the initial transferee is absolute; however, the trustee may not recover from a subsequent transferee who accepted the transfer for value, in good faith and without knowledge of the transfer's voidability. 11 U.S.C. § 550(b)(1); *In re Video Depot, Ltd.,* 127 F.3d 1195, 1197-1198 ( 9th Cir. 1997). No such good faith defense is available to the

11

initial transferee. *Rupp v. Markgraf*, 95 F.3d 936, 938 (10th Cir. 1996). Under Section 550(b)(1), value is

sufficient if it is provided to the initial transferee. *Bonded Financial Services, Inc. v. European*

*American Bank*, 838 F.2d 890, 896-897 (7th Cir. 1988).

Defendant's Third Amended Affirmative Defense alleges that Jones, JL and/or JP "completed"

and "consummat[ed]" the payments at issue, "utilized the Debtor's funds" and "exercised dominion and

control over the Debtor's funds by purchasing goods beneficial to their respective interests." According

to Defendant, this makes Jones, JL and/or JP the initial transferees and Defendant a subsequent

transferee, entitling it to the Section 550(b)(1) defense.

However, Defendant admitted in its Answer that "Debtor paid Defendant . . . " (emphasis added).

Defendant then stipulated in the Joint Pretrial Statement that "Debtor transferred $707,322.95 of its

funds, net of refunds, to Defendant . . ." (emphasis added). Because the funds passed directly from the

Debtor to Defendant, Code Section 550(b)(1) is not available to Defendant.

In *Rupp*, a corporate-debtor's principal (Davis) caused the debtor (Cowboy Enterprises, Inc.) to

purchase a cashier's check with corporate funds payable to Davis's personal creditors (Markgrafs),

which check Davis then delivered to the Markgrafs.[1] The funds were never deposited into a personal

account of Davis before delivery. The trustee filed an adversary proceeding against the Markgrafs,

claiming they were initial transferees of the funds. The district court held the initial transferee was the

bank which issued the cashier's check.

On appeal, the Tenth Circuit first held the bank was a mere conduit and not a transferee, citing

*Bonded:*

" 'the minimum requirement of status as a "transferee" is dominion over the money or

---

[1]Davis's wife, another principal, instructed a bank to issue the cashier's check, apparently at the direction of Davis.

other asset, the right to put the money to one's own purposes.' " *Rupp,* 95 F.3d at 939, quoting *Bonded,* 838 F.2d at 893.

Like Defendant, the Markgrafs argued that Davis exercised dominion and control over the

debtor's funds when he caused the debtor to make the payment, making Davis the initial transferee and

the Markgrafs subsequent transferees. The Tenth Circuit disagreed:

> The issue under § 550 is to what extent the principal, or anyone else for that matter,
> exercised control over the disputed funds *after* the funds left the debtor. Determining the
> *initial transferee* of a transaction is necessarily a temporal inquiry; there must be a
> transfer before there can be a transferee. The extent to which a principal has de facto
> control over the debtor before the funds are transferred from the debtor, and the extent to
> which the principal uses this control for his or her own benefit in causing the debtor to
> make a transfer, are not relevant considerations in determining the initial transferee under
> § 550. *See Nordberg,* 904 F.2d at 598 ("[T]he extent of [the principal's] control over [the
> debtor] generally, and over [the debtor's] actions in transferring the disputed funds to [the
> creditor] in particular, is entirely irrelevant to the 'initial transferee' issue." *Rupp,* 95 F.3d
> at 941.

The court held that the Markgrafs were the initial transferees and Davis was the entity for whose

benefit the transfer was made.

In support of this decision, the court relied on *Bonded*. There the debtor's principal (Ryan)

caused the debtor (Bonded) to send his bank a check payable to the bank, with a note directing the bank

to deposit the check into Ryan's personal account. Ten days later, Ryan transferred the funds from his

account to the bank in payment of a personal debt. The court held Ryan was the initial transferee

because the funds were in his personal account for ten days, giving him dominion over the funds. The

court also stated:

> If the note accompanying Bonded's check had said: "use this check to reduce Ryan's
> loan" instead of "deposit this check into [Ryan]'s account," § 550(a)(1) would provide a
> ready answer. The Bank would be the "initial transferee" and Ryan would be the "entity
> for whose benefit [the] transfer was made." *Bonded,* 838 F.2d at 892.

Yet, as *Rupp* noted:

13

. . . in both cases the principal exercised control over the transferor prior to the transfer of funds and caused the transferor to make the transfer. Thus, the court's reasoning in *Bonded* could not have turned on any evaluation of the principal's control over the debtor. *Id.* at 940.

*Rupp* also relied on the decision in *Richardson v. FDIC,* 164 B.R. 117 (Bankr.N.D.Cal. 1994):

The Court believes that the proper focus when analyzing who is a transferee, is the flow of funds. In order to be an initial transferee, one must be a transferee in the ordinary sense of the word. A transfer that may be avoided under applicable sections of the Bankruptcy Code takes place from the debtor to some entity. Thus, receipt of the transferred property is a necessary element for that entity to be a transferee under § 550. Simply directing a transfer, *i.e.,* such as by directing a debtor to transfer its funds, is not enough . . .

This Court does not disagree that in order to be a transferee one must obtain dominion and control over funds. But that does not mean that merely because one has dominion and control of funds (as principals of companies ordinarily do) that one is also a transferee. Rather, in order for there to be a transfer of the debtor's funds, the debtor must dispose of or part with them, that is, such funds must actually leave the debtor. In order to be a transferee of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else . . . *Rupp,* 95 F.3d at 942.

*Rupp* thus agreed with *Bonded*: "§550 distinguishes transferees (<u>those who receive the money</u> or other property) from entities that get a benefit because <u>someone else received the money</u> or property." *Bonded,* 838 F.2d at 896 (emphasis added).

*Rupp* further noted that Section 550(a)(1) subjects to strict liability both the initial transferee and the entity for whose benefit the transfer was made, who is almost always the party who forces a debtor to make the transfer. The implication is that the entity for whose benefit the transfer was made is different from the transferee, immediate or otherwise. *See Bonded,* 838 F.2d at 895. Holding that the party who forced the transfer is also the initial transferee would collapse the two prongs of strict liability into a single party. *Id.* at 943, citing *General Electric Capital Auto Lease, Inc. v. Broach,* 185 B.R. 801, 809-810 (Bankr. 9th Cir. 1995).

14

*Rupp* also agreed with *Richardson's* conclusion that accepting the Markgraf's argument would

limit a trustee's ability to recover fraudulently transferred funds:

> Turning every unscrupulous principal into the initial transferee does extreme disservice to
> § 550, and twists the word "transferee" beyond recognition. It violates the statutory
> language and purpose and severely and unfairly limits the ability of a trustee to recover
> misappropriated estate property so as to effect a pro rata distribution among a debtor's
> creditors who have been defrauded. It would, as a practical matter, operate to block
> trustees from being able to recover funds fraudulently transferred from debtor's estates in
> numerous bankruptcy cases.

> Rendering the principal an initial transferee to insulate the entity that actually received
> the money, also gives too much power to an unscrupulous insider to effect a fraudulent
> transfer (*e.g.,* to satisfy a personal obligation as was the case here) without allowing a
> trustee to have the means for avoiding the transfer for the benefit of the debtor's
> creditors. *Rupp,* 95 F.3d at 942-943.

In conclusion, *Rupp* noted:

> Our decision here is also consistent with considerations of equity and fairness. In most, if
> not all, bankruptcy cases someone is going to be injured. This is especially true when
> there has been a fraudulent transfer of the debtor's funds. However, Congress has already
> balanced the equitable considerations under § 550 by distinguishing between initial
> transferees, who are strictly liable, and subsequent transferees, who are not strictly liable.
> Initial transferees are in the best position to monitor fraudulent transfers from the debtor.
> *Bonded,* 838 F.2d at 892–93 ("The initial transferee is the best monitor; subsequent
> transferees usually do not know where the assets came from and would be ineffectual
> monitors if they did."). "[Section] 550(b) leaves with the initial transferee the burden of
> inquiry and the risk if the conveyance is fraudulent." *Id.* at 892 . . .  However innocent the
> Markgrafs may have been, they presumably were no less innocent than the other creditors
> of the Cowboy estate who have been injured by this fraudulent transfer of funds from the
> Cowboy estate. . . . In any event, Congress has made its own judgment of who should
> bear the risk of loss under these situations when it enacted Section 550, and we are bound
> to accept that judgment. *Rupp,* 95 F.3d at 944.

As also noted in *In re Mortgage Store, Inc.,* 773 F.3d 990 (9th Cir. 2014):

> In the case of a debtor's fraudulent conveyance, injury must fall on either the transferee
> of the conveyance or the debtor's creditors . . . By placing the risk on initial transferees
> rather than creditors, Congress ensured that creditors "need not monitor debtors so
> closely," the idea being that "savings in monitoring costs makes businesses more
> productive." *Id.* at 997, quoting B*onded,* 838 F.2d at 892.

15

*Richardson* concurred:

Under § 550 of the Bankruptcy Code, it is crystal clear that even the "innocent" initial transferee is liable for the fraudulently transferred funds. *See* 4 Collier on Bankruptcy ¶ 550.03 at 550–15 (15th ed. 1993). While policy arguments can be raised on both sides of the issue as to whether an innocent initial transferee *should* be liable for fraudulently transferred funds, the statute is unambiguous on this point . . .

This Court understands the wish to protect certain "innocent" transferees. However, Congress made the decision to render them liable and the Court is troubled by decisions that strain otherwise ordinary definitions of terms contained in the Code in order to accomplish particular results . . .

In sum, the statutory scheme renders the initial transferee liable, whether or not the transferee had knowledge of the fraud. It does disservice to this statutory scheme and eviscerates the fraudulent transfer law to strain in every case to find the principal to be the initial transferee so as to protect a so-called "innocent" recipient of the debtor's funds. *Richardson,* 164 B.R. at 125, 128, 131.

*Rupp's* approach adopted the Eleventh Circuit's in *In re Chase & Sanborn,* 904 F.2d 588 (11th Cir. 1990) and was adopted by the Second Circuit in *In re Red Dot Scenic, Inc.,* 351 F.3d 57 (2nd Cir. 2003) (affirming 293 B.R. 116 (S.D.N.Y. 2003), by the Fourth Circuit in *In re Southeast Hotel Properties Ltd. Partnership,* 99 F.3d 151 (4th Cir. 1996) and by the Ninth Circuit in *Matter of Walldesign, Inc.,* 872 F.3d 954 (9th Cir. 2017), who termed it the "majority approach, or 'one- step transaction' approach." *Id.* at 964. In response to the argument by the recipients of the funds that it would be inequitable to not hold the corporate principal to be the initial transferee, *Walldesign* agreed with *Rupp*:

Although the equities seem harsh at first glance, our reading of the statute and the case law persuades us that the district court was correct. By enacting 11 U.S.C. § 550, Congress assigned liability for repaying voidable transfers to both the "good guys" (initial transferees, like the appellants) and the "bad guys" (those for whose benefit the transfer was made, like corporate cheats), because "good guys" who are party to those transfers generally stand in a better position to guard against corporate fraud than do unsuspecting creditors . . .

But in any event, "[w]e need not weigh the merits of th[e] trade-off" between assigning responsibility to seemingly innocent initial transferees . . . and creditors . . . because Congress already performed that task for us. *In re Mortg. Store*, 773 F.3d at 997. Here, as in *In re Mortgage Store* and other cases, "[i]t would be inappropriate for us to second-guess Congress' considered judgment on this matter of policy." *Id.* at 959, 972.

*Walldesign* acknowledged that a minority of courts have adopted the "two-step transaction" or "minority approach," holding that the initial transferee is the corporate principal who caused the transfer. The court noted that the minority approach "misallocates the monitoring costs" that § 550 sought to impose ("After all, foxes (like corporate cheats) rarely guard henhouses (like corporate treasuries) with much success") and deprives the trustee of a potential source of recovery for creditors: "And Congress likely decided that 'recovery from [an] embezzling principal would be difficult, thus it also made the first recipient of those funds liable to returning them.' " *Id.* at 965, citing *In re Global Protection USA, Inc.,* 546 B.R. 586, 625 (Bankr. N.J. 2016).  It also noted that the minority approach relies on equitable principles and a concern that seemingly "innocent" third parties will be held liable for fraudulent transfers (which concerns, as noted above, were rejected by Congress). It concluded by citing its decision in *Video Depot,* which noted that, other than tentative support expressed by the Sixth Circuit in *In re Nordic Village., Inc.,* 915 F.2d 1049, 1055 and fn.3 (6th Cir. 1990), *rev'd on other grounds,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), no circuit court has based a decision on the minority approach.  *Walldesign,* 872 F.3d at 966.[2]

*Rupp* was followed in *In re Peregrine Financial Group, Inc.,* 589 B.R. 360, 372-376 (Bankr.N.D. Ill. 2018). *Rupp* and *Walldesign* were followed in *Reinbold v. Rock Island County, Illinois et. al.,* Adv. No. 19-8116 (Bankr.C.D.Ill. 2020) (Ex. X attached), in which Judge Perkins noted:

---

[2]*Nordic Village's* support for the minority approach was *dictum. Walldesign* also noted that *Nordic Village* relied on two pre-*Bonded* cases. *Id.*

The flow of funds matters. In order to be a transferee under § 550, as distinguished from a non-transferee who incurs liability as one who benefits from the transfer, receipt and possession of the transferred property is necessary. An owner or officer of a company who has the power to transfer the company's funds is not a transferee unless he receives and possesses the funds, such as having them deposited into his personal bank account. If he simply causes the company to make a payment from the company's account directly to a third party, even for his personal benefit, he is not a transferee but, instead, is one for whose benefit the transfer was made.  Since he is not a transferee at all, he cannot be the initial transferee. *Id.* at 6 (citations omitted).

For all of the above reasons, because the payments went directly from Debtor to Defendant, Defendant, not Jones, JL or JP, was the initial transferee and is not entitled to the Section 550(b)(1) defense.

C.     Even if this Court adopts the minority approach, Defendant's Third Amended Affirmative Defense still fails because Debtor authorized JL, JP and Jones to make the payments.

A person who undertakes to manage some affair for another, on the authority and for the account of the latter, who is called the principal, is an agent. *In re Morys' Estate,* 17 Ill.App.3d 6, 9, 307 N.E.2d 669, 671 (1st Dist. 1973); *Associates Discount Corp. v. Goetzinger,* 245 Iowa 326, 330, 62 N.W.2d 191, 193 (Iowa 1954). A corporation necessarily acts through its agents; the acts of an agent are considered in law to be those of the principal. *Braught v. Board of Educ. of Mount Prospect Public School Dist. No. 57,* 136 Ill.App. 3d 486, 489, 483 N.E. 2d. 623, 626 (1st Dist. 1985); *Gablemann v. NFO, Inc.,* 571 N.W.2d 476, 480 (Iowa 1997). Whatever an agent does within the scope of the agent's actual authority binds the principal. *Gablemann,* 571 N.W.2d at 481; *Parker v. Symphony of Evanston Healthcare, LLC,* 2023 IL App (1st) 220391, ¶ 26.

Assuming Jones, JL and/or JP, individually or through their agents, used Debtor's credit cards to make the payments in issue, they were authorized to do so by Debtor's owner or agents, i.e.,  by Jones

(owner/manager), Mitch Melega (controller) and/or Lois Estabrook (accountant).[3] Jones, JL and/or JP

thus acted as authorized agents of Debtor for the sole and limited purpose of using Debtor's credit cards

to make the payments in issue directly to Defendant. Their authorized actions in so using the credit cards

are deemed to be the actions of, and were binding on, Debtor.

     Even if the Court adopts the minority approach, it would not change the result. Under this

approach, because Debtor authorized the payments, the Debtor exercised dominion and control over its

own funds, and Defendant is the initial transferee.

     D.    <u>Defendant's Fourth Amended Affirmative Defense is legally insufficient because filing a
Rule 12(b)(6) motion is the proper way to raise the defense of failure to state a claim
upon which relief can be granted, which Defendant has already done twice
unsuccessfully.</u>

     Defendant's Fourth Amended Affirmative Defense alleges that Plaintiff's Complaint should be

dismissed pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr.P.

7012(b)(6), for failure to state a claim upon which relief can be granted, citing *Bell Atlantic v. Twombly,*

550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

     Defendant previously filed two motions to dismiss under Rule 12(b)(6) and two accompanying

memorandums, all of which cited *Twombly.* Both motions were denied.

     In *Raquet v. Allstate Corporation,* 348 F.Supp.3d 775 (N.D.Ill. 2018), the defendant filed a Rule

12(b)(6) motion. It also answered and asserted "failure to state a claim" as an affirmative defense.

While noting that whether "failure to state a claim" can be properly asserted as an affirmative defense is

not settled within the Seventh Circuit, the court adopted the view that it is not technically an affirmative

defense and should be raised by motion. Further, defendant's filing of a motion to dismiss under Rule

---

[3]In fact, as Defendant admitted in its Answer and in the Pretrial Statement that Debtor made the payments to Defendant, it
has admitted the payments were made with Debtor's authority.

19

12(b)(6) "obviat[ed] any need to contemporaneously plead 'failure to state a claim' as an affirmative

defense." *Id.* at 786. The court struck the defense with prejudice.

      Defendant's "failure to state a claim" defense is not a proper affirmative defense, as it does not

admit the allegations in Plaintiff's Complaint but then attempt to avoid liability by raising new matters

outside the pleadings. *Reed v. Columbia St. Mary's Hospital,* 915 F.3d 473, 477 and fn. 1 (7th Cir.

2019); *In re Olympia Brewing Co. Sec. Litig.,* 1985 WL 3928, at *2 (N.D. Ill. 1985). Further, as

Defendant has already filed two motions to dismiss based on *Twombly,* there is no need to file an

affirmative defense raising *Twombly* once again.

## IV. CONCLUSION

      WHEREFORE, for the reasons stated above, Plaintiff prays that, pursuant to Fed.R. Bankr. P

7056, this Court enter summary judgment in her favor and against Defendant (a) denying Defendant's

Second, Third and Fourth Affirmative Defenses; and (b) granting Plaintiff such other relief as is just.

Jeana K. Reinbold, solely as Chapter 7 Trustee of
the Estate of I80 Equipment, LLC

By: /s/ Andrew W. Covey
One of her attorneys

Andrew W. Covey #06183817
416 Main Street, Suite 700
Peoria, IL 61602
Tel: 309-674-8125
Email: acovey1@hotmail.com

**PROOF OF SERVICE**

The undersigned certifies that a true and accurate copy of the above document was duly served upon anyone who has electronically entered his appearance herein by notice of electronic filing on 11/22/2023.

Dated: November 22, 2023                    /s/Andrew W. Covey

*Andrew W. Covey #06183817*
*416 Main St., Suite 700*
*Peoria, IL  61602*
*Phone:  (309) 674-8125*
*Email:  acovey1@hotmail.com*