UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In re:<br>I80 Equipment, LLC<br>    Debtor | Case No. 17-81749<br><br>Chapter 7 |
| Jeana K. Reinbold, solely as Chapter 7 Trustee of the Estate of I80 Equipment, LLC<br>    Plaintiff,<br>v.<br>Menard, Inc.<br>    Defendant | AP. No. 19-8110<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COMES Jeana K. Reinbold, solely as Chapter 7 Trustee of the Estate of I80 Equipment, LLC ("Plaintiff") and, pursuant to Fed. R. Bankr. P. 7056, for her Cross Motion for Summary Judgment ("Motion") in her favor and against Defendant, Menard, Inc. ("Menard") as to Plaintiff's claim that the Debtor, I80 Equipment, LLC ("I80" or "Debtor") transferred an interest of I80 in property, consisting of $707,322.95 of its funds, to Menard, states as follows:

**I. INTRODUCTION**

On September 19, 2024, Menard filed a motion for summary judgment against Plaintiff, in part claiming that there is no genuine dispute that I80 did not transfer an interest in property of I80 to Menard because the transfers at issue in this case were made by credit card and no funds passed through an account of I80.

However, Menard has judicially admitted, and this Court has already ruled, that I80 did transfer $707,322.95 of its funds to Menard. There thus is no genuine dispute of material fact as to Plaintiff's said claim.

.         Accordingly, Plaintiff respectfully requests that she be granted partial summary judgment on her claim that I80 transferred an interest of I80 in property, consisting of $707,322.95 of its funds, to Menard.

## II. UNDISPUTED MATERIAL FACTS

1.        I80 filed a chapter 7 bankruptcy petition herein on December 6, 2017. Pretrial Statement, PDF 3, p. 6, ¶ 6 (attached).

2.        Plaintiff filed her Complaint herein on December 5, 2019, which Complaint sought to avoid and recover $707,322.95 of fraudulent transfers allegedly made by Debtor to or for the benefit of Defendant within two (2) years of filing bankruptcy. PDF 1 and 1 (attached).

3.        In its Answer filed September 22, 2020, Menard admitted that ". . . [I80] paid [Menard] by credit card, debit and/or check for goods purchased at its retail stores within two years of [I80's] bankruptcy." PDF 2, p.5, ¶ 16 (emphasis added) (attached).

4.        In the Joint Statement of Uncontested Facts portion of the Pretrial Statement filed November 16, 2020, Menard admitted the following:

> 10. Within two (2) years of bankruptcy, [I80] transferred $707,322.95 of its funds, net of refunds, to [Menard] by credit card, debit and/or check. The dates and amounts of such transfers are set forth on Exhibits "A" through "C" attached to Plaintiff's Complaint filed herein (Court Docs. 1-1, 1-2 and 1-3). PDF 3, p. 7, ¶ 10 (emphasis added) (attached).

5.        In its Amended Affirmative Defenses filed May 3, 2022, Menard admitted under **First Affirmative Defense – Good Faith Transferee:**

> 4. All of the goods purchased in each retail transaction have a retail price for which the guest must pays (sic) to [Menard] before taking the goods from [Menard's] location . . .
>
> 7. Each retail transaction involved [I80], through one of its agents, using a credit card or debit card owned and funded by [I80], to pay for the

<u>goods purchased.</u> PDF 4, p. 3 (emphasis added) (attached).

6. On or about February 16, 2023, Plaintiff and Menard entered into a Stipulation, which in part provided:

> 1. Any documents described in Plaintiff's Request to Admit ("RTA") served on [Menard] on or about 4/7/2022 which state(s) "Transaction Detail" in the upper left-hand corner were produced by [Menard] in response to Plaintiff's Request to Produce Documents served on [Menard] on December 4, 2020 ("Transaction Detail(s)"); . . .
>
> 2. All Transaction Detail(s) relate to the purchase[1] of goods[2] from [Menard] <u>for which the purchase price was paid by [I80]</u> at the time of purchase. PDF 8, pp. 1-2 (attached) (emphasis added).

7. Plaintiff served her RTA on Menard on April 7, 2022. PDF 7.1 through 7.4, pp. 1-23 (attached). The Transaction Details referred to in the RTA are attached hereto. PDF 9.11 through 9.28 (attached).

8. Menard admitted in its Uncontested Material Facts set forth in its Motion for Summary Judgment (Doc. 128) (Menard's Motion"):

> 9. Apart from one purchase on April 6, 2016, the Transactions all involved payment using a credit card. ECF No. 1, Exs. A-C.
>
> 10. One purchase on April 6, 2016, was not made via credit card and was for $80.46. ECF No. 1, Ex. A, p. 2.
>
> 11. $707,242.49 of the Transfers involved payment made using a credit card. ECF No. 1, Exs. A-C.
>
> 33. Attachment B of Claim 5-2 includes a ledger of all of the Transfers made by Debtor to Menard which are the subject of this adversary proceeding. ECF No. 95, p. 6. Menard's Motion, pp. 3-4, 6 (attached).

. 9. I80's credit card statements on the credit cards issued by First Midwest Bank and U.S.

---

[1] As defined RTA ¶ 51.

[2] As defined at RTA ¶ 51.

Bank include most of the credit card payments[3] made by I80 to Menard that are at issue in this proceeding. John Arnold Declaration, PDF 19, pp. 5-6; Ex. G, Parts 1-4 PDF 19.156 to PDF 19.159 (attached); Kristina Anderson Declaration, PDF 22.1 pp. 1-7; Parts 4-9, PDF 22.4 - starting at p. 52 to PDF 22.10) (attached).

10. I80 made numerous large monthly payments to each of the credit card companies (John Arnold Declaration, Ex. G, Parts 1-4 PDF19.156 starting at p. 2 to PDF 19.158; Kristina Anderson Declaration, Parts 4-9, PDF 22.4 starting at p. 66 to PDF 22.9.

11. In its Third Affirmative Defense filed May 3, 2022 Menard claimed it was a subsequent transferee. PDF 4, p. 4.

12. On November 22, 2023, Plaintiff filed her Motion For Partial Summary Judgment, in part seeking judgment in her favor denying this Defense. Doc. 83, pp. 11-19 (attached).

13. In its Order entered April 15, 2024, this Court granted Plaintiff's said Motion denying this Defense, ruling in part:

> **II. Menard was the initial transferee of the transfers identified in the Complaint.**
>
> The legal question that the parties have teed up is whether a retailer should be treated as an initial or subsequent transferee of corporate funds when a corporate official authorizes the use of those funds to purchase goods that will be used by entities other than the corporation. The Trustee is correct that the retailer is an initial transferee in that situation . . .
>
> Just as we do not treat the cashier as the initial transferee (for she does not exercise dominion and control over Menard's funds), so too do we not treat an authorized user of the corporation's credit card accounts as an initial transferee . . .
>
> There is no doubt that Menard received funds over which it had complete dominion and control when the Debtor paid it over $700,000. . . .
>
> Again, these are simple transactions: [I80] paid Menard money. Menard is the initial transferee of that money.

---

[3] The U.S. Bank statements start with the statement dated March 25, 2016.

4

. . . Menard cannot be treated as a subsequent transferee of the Debtor's funds in the transactions alleged in the complaint. . . . There is no genuine dispute of material fact that the Debtor transferred its funds to Menard in each of the transactions pleaded in the complaint. Menard was the initial transferee in those transactions. . . (Doc. 107, p. 3-5) (emphasis added) (attached).

### III. ARGUMENT

Summary judgment is appropriate only if, drawing all reasonable inferences in favor of the nonmoving party, the court concludes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Matter of Smith,* 966 F.2d 1527, 1529 (7th Cir. 1992), *cert. dismissed* 113 S.Ct. 683, 121 L.Ed.2d 604. For a factual dispute to be "genuine," the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

   A.   <u>Nearly four years ago, Menard judicially admitted that I80 transferred $707,322.95 of its funds to Menard.</u>

In the Pretrial Statement filed November 16, 2020, Menard admitted that "[I80] transferred "707,322.95 of its funds . . .to Menard . . ." Undisputed Material Facts, ¶ 4.

As noted in *Soo Line R. Co. v. St. Louis Sw. Ry. Co.,* 125 F.3d 481 (7th Cir. 1997):

"Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." (citations omitted) . . . and although the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible. *Id.* at 483.

In *In re Kaiser,* 566 B.R. 550 (N.D. Ill. 2015), the court stated:

[Defendant] stated that position in written documents submitted to the bankruptcy court, including her answer and interrogatory responses. A party may be bound to statements she made in her answer as judicial admissions. (citations omitted) . . . In addition to statements in a party's pleadings, "[a]ny 'deliberate, clear and unequivocal' statement, either written or oral, made in the course of judicial proceedings qualifies as a judicial admission." (citations omitted) . . . [Defendant's] statements. . . were made in writing-

and therefore with opportunity for careful consideration-and volunteered without any prompting or suggestion by the Trustee . . . *Id.* at 556.

A judicial admission is not evidence at all but rather has the effect of withdrawing a fact from contention. *Chow v. Aegis Mortg. Corp.,* 185 F.Supp.2d 914, 916 (N.D.Ill. 2002).

Menard's above admission is a "deliberate, clear and unequivocal" statement that I80 transferred an interest of I80 in property ($707,322.95 of its funds) to Menard. This is a binding judicial admission.

> B.  Further, Menard has judicially admitted that I80 paid it $707,322.95, all but $80.46 of which were paid by I80's credit card, which necessarily admits that said funds were property of I80.

In this proceeding, Menard has repeatedly made binding judicial admissions that it was paid $707,322.95 by I80, all but $80.46 by credit card. Undisputed Material Facts, ¶¶ 3-8. I80's credit card statements also establish this as to most of the payments. *Id.* at ¶ 9.

Given the above, this proceeding is controlled by the holding in *Smith*, a case decided after the Supreme Court's decision in *Begier v. I.R.S.,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.E.2d 46 (1990). In *Smith,* the debtor wrote a check to a creditor (Baker & Schultz) for $121,345.11 and, on the same day, deposited $125,000 into his checking account. The debtor's bank provisionally credited the account in this amount and paid the $121,345.11 check the next day. Five days later, the debtor's bank learned that the $125,000 check had bounced, and "charged back" the provisional credit, creating an overdraft of $121,290.53. Baker & Schultz refused to return the funds to the bank, contending the payment was final.

Within 90 days, the debtor filed bankruptcy, and the trustee sought to recover the $121,345.11 from Baker & Schultz as a preference. The district court held that the payment was a transfer of the bank's property and there had been no diminishment of the estate.

The Seventh Circuit reversed. The Court held for a transfer of a debtor's funds to occur (1) the debtor must exercise control over the funds, meaning it determines the disposition of the funds and designated the creditor to whom payment is made; and (2) the transfer must result in a depletion or diminution of the debtor's *estate. Smith,* 966 F.2d at 1531-1537, fn. 12,13.

The Court first held the debtor exercised control because he selected and paid off a single creditor. *Id.* at 1533-1534.

With regard to diminution of the debtor's estate, Baker & Schultz argued that because the credit was revoked 5 days after the payment, the money that it received would never have been available for bankruptcy distribution had it not been paid. *Smith* rejected this argument:

> Nevertheless, the transfer did "cheat" other creditors out of what they might otherwise have received, since the Debtor could have paid all creditors pro rata at the time he chose to pay Baker & Schultz. This scenario reveals an ambiguity with regard to timing. To say that the estate has been diminished would initially seem to mean that the pool available to creditors at the commencement of the case has been depleted from what it would have been but for the transfer; in other words, the estate as it exists at the commencement of the case is compared to what the estate would have included if there had been no transfer. <u>But it could also be interpreted more broadly to include diminishing the pool available to creditors at any time after the start of the 90–day preference period; then the debtor's pre-transfer property (that could be used to pay creditors) would simply be compared to its post-transfer property.</u> The cases take both approaches. (citations omitted). The first approach seems to be called for by the locution "diminution of the *estate* ": since there is technically no estate until the time that bankruptcy proceedings commence, that would appear to be the crucial moment for scrutiny. But the more expansive approach seems to be supported by section 547 itself (which does not mention the "estate") and by the purposes underlying the preference-recovery provision. One can also argue that section 547 creates a functional "estate" 90 days before the filing of the petition, so that the diminution can occur during that earlier period. The very point of the preference-recovery provision is in a sense to engage in the legal fiction that the bankruptcy "estate" extends backward in time by 90 days. We conclude in the present case that the Debtor's estate was diminished by the transfer. First, even under the first approach, the estate may have been larger "but for" the transfer to Baker & Schultz. This comparison is itself full of ambiguity because it is based on a counter-factual (what the estate "would have been" had the transfer not occurred). For a period of five days, however, the Debtor did have access to $125,000 through the provisional credit. As mentioned earlier, he could have purchased a yacht or

acquired some other assets instead of paying his debt to Baker & Schultz; so his assets at the time the petition was filed could have been more substantial than they actually were. Second, we do not think that a strict construction of the "estate diminution" requirement should defeat recovery in the circumstances of this case. All the explicit elements of section 547(b) have been met and the Trustee's recovery here is supported by the statute's purposes. Moreover, such a strict approach applied to indirectly borrowed funds would undermine the rule governing transfers of borrowed money and would effectively overrule cases such as *Smyth*. <u>When a debtor effectively borrows nonearmarked funds and exercises control by using the funds to pay a preferred creditor over others, the estate has been diminished.</u> *Smith*, 966 F.2d at 1536–37. (emphasis added). *Accord, In re Marshall,* 550 F.3d 1251, 1257-1258, fn. 6 (10th Cir. 2008).

Under the "expansive approach," the estate is necessarily diminished if the "control" test is met, because the estate's pre-transfer property will always be greater than its post-transfer property.

*Smith* also held it did not matter whether debtor had a right to withdraw the funds by statute, agreement, policy or by "grace" (*Id.* at 1531, fn. 9): "Although the Bank was not statutorily required to extend provisional credit, it nevertheless did so, apparently as a matter of policy." *Id.* The Court noted the "real question" was:

> . . . whether the Debtor was actually able to exercise sufficient dominion and control over the funds to demonstrate an interest in property . . . the Debtor exercised dominion and control over the funds by making actual payment to a creditor . . . The point is that the Debtor exercised significant control (over a significant amount of money) in choosing to pay off a single creditor . . . At the moment that the Debtor's payment to Baker & Schultz was achieved (that is, when the Bank honored check number 1141), the provisional credit ripened into an interest in property of the Debtor. *Id.* at 1531, 1535, fn. 12.

The Court further stated that what occurred in the case was no different than if the debtor had gone to the bank, taken out five-day loan in cash and used the cash to pay the creditor. *Id.* at 1532.

As noted, Menard has repeatedly judicially admitted that I80 paid Menard. Menard has thus judicially admitted that I80 met the "control" test because it designated that Menard be paid and determined, or controlled, the disposition of the funds to Menard. The credit card statements contain hundreds if not thousands of payments made by I80 during the two year period before bankruptcy.

Undisputed Material Facts, ¶ 9. This large number would indicate that I80 had a contractual right to exercise control over these funds. But even if I80 only exercised control over the funds by the "grace" of the credit card companies, it makes no difference. The "point" is I80 designated Menard as the recipient and the payments were made. At the moment payments were achieved (or perhaps a "nanosecond before," when the credit card companies honored I80's draws on its lines of credit – see *In re Marshall,* 550 F.3d at 1256-1257, fn. 6 (10th Cir. 2008)), the lines of credit "ripened" into an interest of I80 in property. When banks loan money, the "borrowed money is the borrower's own money." *Smith,* 966 F.2d at 1531-1535, fn. 9, 12. There is no genuine issue of material fact that I80 exercised "control" over each payment made to Menard.

As to diminution of I80's estate, under the "expansive" approach, this estate was diminished because (a) during the applicable two year period prior to bankruptcy under 11 U.S.C. § 548 (rather than the ninety day preference period), I80's creditors were "cheated," as I80 could have used the $707,322.95 to pay its own creditors rather than fraudulently transferring such funds to Menard; (b) of § 548's purpose, which is to protect a debtor's unsecured creditors from unfair reductions in the debtor's estate to which creditors usually look for security. *In re Randy,* 189 B.R. 425, 444 (Bankr. N.D. Ill. 1995); (c) 11 U.S.C. § 548 creates a functional estate arising two years before bankruptcy; and (d) the strict approach would undermine the rule established in many cases that borrowed funds can be used to make fraudulent or preferential transfers (see *infra*). Because, under the "expansive" approach, (a) through (d) will always exist, diminution necessarily occurs if the debtor meets the "control" test.

Further, as *Smith* notes, even under the strict approach, I80's estate was still diminished by the transfers to Menard, because I80 could have used the $707,322.95 to purchase assets which could have

9

been available on the date of bankruptcy for distribution to creditors.

It was irrelevant that in *Smith* the funds were deposited into the debtor's bank account. Since the provisional credit was revoked 5 days after the payment, the funds would not have been available to creditors on the date of bankruptcy had the transfer not been made. Yet *Smith* still held that the transfer was avoidable because the debtor exercised dominion and control over the funds by making the payment and the payment diminished the estate during the expanded period. Under *Smith,* it makes no difference whether funds are deposited into the debtor's bank account.

The majority opinion in *Smith* does not cite *Begier* (although the dissent does). *Begier* is inapplicable to the facts in *Smith* and in this proceeding. *Begier* held that payments of withholding taxes and excise taxes to the IRS were not avoidable under § 547 because the funds paid were not property of the debtor prior to payment; instead, they were held in trust for the IRS. The Court thus was not presented with the issue of whether to apply the "strict" or "expansive" approach to estate diminution, because the funds paid were never property of the debtor. Further, this proceeding does not involve the payment of funds held in trust by I80.

Menard cites *Mann v. LSQ Funding Group, L.C.,* 714 F.4th 640 (7th Cir. 2023). In this case, a trustee sought to avoid a pre-petition payment of $10.3 million made by a new lender (Millennium) directly to an existing creditor (LSQ) of the debtor as both a preferential and fraudulent transfer.[4] The defendant, LSQ, filed a motion for summary judgment. The bankruptcy court granted the motion, concluding that, under the "earmarking" doctrine, the payment was not a transfer of the debtor's property. The district court affirmed on the basis of this doctrine.

The Seventh Circuit affirmed, purportedly not under the "earmarking doctrine," but on the

---

[4] Millennium also received LSQ's interest in the debtor's accounts receivables. No accounts receivables were transferred to the credit card companies in this case.

basis of a careful reading of the Bankruptcy Code and the application of their precedent.[5] Citing *Smith* and *Begier*, as does Menard, the Court stated that it was not necessary for it to decide the question of control because there plainly was no diminution of the estate. *Mann,* 714 F.4th at 646. The Court noted that the transfer went directly from Millennium to LSQ and never passed through the debtor's accounts; further, there was nothing in the record suggesting Millennium would have paid the debtor directly. *Id.* at 647.

However, Plaintiff believes that *Mann,* despite its claim otherwise *(Id.* at 645), did "focus" on the "earmarking doctrine." *Smith* discussed the requirements of the doctrine:

> In the bankruptcy setting, courts have held that transfers by a debtor of borrowed funds constitute transfers of the debtor's property . . . As *Collier* explains:
>
> A payment by a debtor with borrowed money, however, may constitute an avoidable preference where the loan so used was not made upon the condition that it should be applied to the particular creditor to whom it was paid over. Similarly, a payment made by a third party to a creditor of the debtor may likewise amount to a preferential transfer, when such payment represents a loan by the third party to the debtor and the debtor, rather than the lender, designates the creditor to be paid and controls the application of the loan. 4 *Collier on Bankruptcy* ¶ 547.03, at 547–28 (15th ed.1992) (footnotes omitted). As a general rule, then, a debtor's transfer of borrowed funds is a preferential transfer of the debtor's property under section 547(b), assuming the other elements of that section are met.
>
> The situation distinguished by *Collier* and the other authorities is an exception to the general rule, known as the "earmarking" doctrine. That doctrine is applicable only where a third party lends money to the debtor *for the specific purpose of paying a selected creditor. See, e.g., Bohlen Enterprises,* 859 F.2d at 566. In such circumstances the payment is "earmarked" and <u>the third party simply substitutes itself for the original creditor.</u> Such a transfer is said not to be a preferential transfer because (1) the debtor never exercises "control" over the new funds; and (2) the debtor's property (i.e., the fund out of which creditors can be paid) is not diminished. *Smith*, 966 F.2d at 1533. (underlined emphasis added).
>
> Earmarking does not apply when the choice of which creditor to be paid is entirely made by the

---

[5] See *infra.*

11

debtor. *In re Hurt,* 202 B.R. 611, 613 (Bankr.C.D. Ill. 1996). As noted in *In re Engstrom, Inc.,* 648 B.R. 617 (Bankr. E.D. Wis. 2021):

> In summary, if a creditor makes a general loan and does not condition it upon a particular creditor receiving the proceeds and the funds could have become generally available to all creditors of the debtor, the debtor exercises control over those funds, the transfer is a "transfer of an interest of the debtor in property," the earmarking doctrine does not apply, and the loan is subject to the trustee's avoidance powers . . .
>
> By contrast, if the creditor does not make a general loan and conditions the loan upon the payment of a particular creditor and the funds could have never become generally available to all creditors, the debtor does not exercise control over those funds, the transfer is not a "transfer of an interest of the debtor in property," and the earmarking doctrine applies such that there is no liability under 11 U.S.C. § 544, 547, or 548. *Id.* at 629.

In *Smith,* the Court held earmarking did not apply because the loan was not conditioned on Baker & Schultz's being paid off; the debtor exercised control by selecting and paying off a single creditor, and the debtor's property was diminished. *Smith,* 966 F.2d at 1533.

*Mann* stated:

> The bankruptcy court entered summary judgment for LSQ based on the so-called "earmarking doctrine." <u>This widely recognized doctrine</u> exempts from § 547(b)'s avoidance power financial transactions <u>like the payoff agreement here</u>—where one creditor gives a debtor "earmarked" funds to pay off a specific debt in full, thereby assuming the original creditor's position . . .
>
> As we described in *Matter of Smith,* Millennium "<u>substitute[d] itself for the original creditor</u>," LSQ, in every way. . .
>
> The Trustee asks us to avoid the $10.3 million transfer, but that transfer went directly from Millennium to LSQ. Although the Trustee contends that avoidance would somehow make the transferred funds part of the Debtor's estate, he did not explain how. After all, the $10.3 million never passed through the Debtor's accounts in the first place, <u>nor is there any suggestion in the record that Millennium would have paid the Debtor directly if the contract had not worked out with LSQ</u>. *Mann,* 71 F.4th at 644, 646-647 (emphasis added).

The Court thus specifically found that (a) Millenium would not have paid the debtor directly if

the contract had not been worked out with LSQ; and (b) Millennium substituted itself for the LSQ "in every way."[6] These are the requirements/characteristics of earmarking. *Mann* even expressly stated that the "earmarking doctrine" applied to "the payoff agreement here. . . " *Id.*

Further, *Mann* held there was no transfer of the debtor's property solely because the transfer did not diminish the debtor's estate; it claimed it did not decide "control." 714 F.4th at 646, 648. But, if the debtor did exercise control, then the only way *Mann* could have found no estate diminution was to have adopted the "strict approach." However, this would have amounted to a rejection of the "expansive" approach adopted in *Smith*. But, under *stare decisis,* before overruling longstanding circuit precedent, the Seventh Circuit will identify explicit reasons that justify such action. *United States v. Thomas,* 27 F.4th 556, 559 (7th Cir. 2022). *Mann* identified no such reasons; in fact it stated that it applied "our precedent." *Id.* at 645. Therefore, *Mann* must have decided the debtor had no "control" and must have applied earmarking.[7] If a payment is earmarked, there is no diminution of the debtor's property. *Smith,* 966 F.2d 1533.

*Mann* noted that the funds never actually passed through the debtor's accounts. *Id.* at 646. This is irrelevant. As 11 U.S.C. § 101(54) makes clear, transfers need not be made directly by the debtor. A debtor may transfer its right to receive a portion of the sales price of its assets to a creditor *Warsco v. Preferred Technical Group,* 258 F.3d 557, 564-565 (7th Cir. 2001), citing *Smith.* Further, earmarking does not depend on whether the debtor obtained temporary possession of new loan funds, but instead on whether the debtor was obligated to use those funds to pay an antecedent debt. *In re Flanagan,* 503 F.3d 171, 185 (2nd Cir. 2007), citing *5 Collier on Bankruptcy,* ¶ 547.03[2], at 547-24; *In re Superior*

---

[6] As the bankruptcy court explained: "The Debtor had no ability or discretion to transfer the $10,306,661.56 wire transfer to any person or entity other than LSQ." *In re Engstrom, Inc.*, 648 B.R 617, 630 (Bankr. Wis. 2021).

[7] *Mann* noted there was "scant" evidence on the second part of the "control" test and the Trustee never argued the issue. *Id.* at 645.

*Stamp & Coin, Inc.,* 223 F.3d 1004 (9th Cir. 2000): " . . . the proper inquiry is not whether the funds entered the debtor's account, but whether the debtor had the right to disburse the funds to whomever it wished . . ." *Id.* at 1009; accord, *In re Montgomery,* 983 F.2d 1389, 1395 (6th Cir. 1993).

Earmarking, however, does not apply to this proceeding. There is no genuine dispute that I80 designated that Menard be paid and controlled the disposition of the funds to Menard.

If *Mann* nonetheless did adopt the "strict approach," thereby rejecting *Smith* and violating *United States v. Thomas, supra, Smith* still controls this proceeding. *Mann* noted that "the parties agree[d]" that the $10.3 million would not have been part of the debtor's estate (71 F.4th at 646); that the trustee had admitted at oral argument that the transaction had "no adverse effect, no diminution. . . on other creditors." (*Id.* at 646); and that "The Trustee does not address any of these points." (*Id.* at 648). The Court concluded:

> The <u>Trustee in this case concedes</u> that the transfer at issue here did not diminish the Debtor's estate. Under our established precedent, this means he failed to show that the transfer involved an "interest of the debtor in property." *Id.* at 648 (emphasis added).

The issue of estate diminution was not contested in *Mann.* Mann's statements on this issue were thus *dictum* and may be rejected by this Court.

In *United States v. Crawley,* 837 F.2d 291 (7th Cir. 1988), the issue was whether a statement by the Court in a prior case was a holding or *dictum.*

> An alternative to definition [of dictum] is to ask what is at stake in the definition. What is at stake in distinguishing holding from dictum is that a dictum is not authoritative. It is the part of an opinion that a later court, even if it is an inferior court, is free to reject. So instead of asking what the word "dictum" means we can ask what reasons there are against a court's giving weight to a passage found in a previous opinion. <u>There are many. . . another, that the issue addressed in the passage was not presented as an issue, hence was not refined by the fires of adversary presentation. All these are reasons for thinking that a particular passage was not a fully measured judicial pronouncement</u> . . . *Id. at* 292–93 (emphasis added). See also *Cross v. Burke,* 146 U.S. 82, 87, 13 S.Ct. 22, 23, 36 L.Ed. 896 (1892).

14

The trustee in *Mann* stipulated that the payment in issue did not diminish the debtor's estate. As the diminution issue was not "refined by the fires of adversary presentation," *Mann's* statements regarding diminution are *dictum.* This is apparent from a reading of the decision. Although it cited *Smith* and purported to follow "established precedent"(71 F.4th at 648), nowhere did it discuss *Smith's* adoption of the "expansive" approach or the reasons therefore. *Mann's* statements were thus not a "fully measured judicial pronouncement" on the diminution requirement.

*Mann* is thus inapplicable to this proceeding. But, even if it does apply, it is distinguishable. *Mann* noted the trustee did not explain how avoidance of the transferred funds would somehow make them part of the debtor's estate, and that returning the $10.3 million to Millennium was the only way to reverse the payoff. Thus, avoiding the transfer would benefit the allegedly defrauded creditor (Millennium) and no others, a "perverse result."

Avoidance of the fraudulent transfers here will make them recoverable by Plaintiff from Menard pursuant to 11 U.S.C. § 550(a)(1), whereupon the funds will be available to all creditors holding allowed claims against this estate. This is not a "perverse result."

Numerous courts have held that transfers made by credit card directly to a third party are avoidable where the debtor selected the creditor to be paid: *In re Marshall, supra* (citing *Smith* and *Begier* and noting that the majority of courts hold that direct payments by credit card are transfers of "an interest of [Debtors] in property," even though the debtor's interest is only "fleeting," 550 F.3d at 1256-1257); *In re Wells,* 561 F.3d 633 (6th Cir. 2009); *In re Hurt,* 202 B.R. 611 (Bankr. C.D.Ill. 1996); *In re Anderson,* 275 B.R. 264 (Bankr. W.D.Ky. 2002); *In re Getman,* 218 B.R. 490 (Bankr. W.D.Mo. 1998); *In re Spitler,* 213 B.R. 995 (Bankr. N.D. Ohio 1997) (citing *Smith* and holding the

debtor's estate was depleted).[8] *Spitler* also noted (in agreement with *Flanagan)*:

> In the present case, if the debtors had made the convenience check payable either to themselves or to cash, deposited the check in their bank account and then drawn a check on that bank account payable to [the preferred creditor], the transfer to [the preferred creditor] would represent property of the estate. The court finds no reason for distinguishing the form of the actual transfer at issue from the less direct transfer outlined above. *Id.* at 999. *Accord, Marshall*, 550 F.3d at 1256.

Likewise, instead of paying Menard direct with its credit cards, I80 could have taken cash advances, deposited them into its bank account, and paid Menard. There is no reason to treat these types of transfers different than direct transfers to Menard.

The defendant in *Spitler* cited *Begier* in support of its argument that the credit card payments did not diminish the estate. *Spitler* rejected the argument, noting that it had been rejected in *In re Montgomery,* 983 F.2d at 1396,[9] *Begier* was a trust fund case, and the decision in *Smith* came well after *Begier;* further, the issue was thoroughly addressed in *Smith. Spitler,* 213 B.R. at 999.

Finally, Menard cites *In re First Financial Associates, Inc.,* 371 B.R. 877 (Bankr.N.D.Ind. 2007).  In this case, an employee of the corporate debtor (who was also the principal's fiancée) used the debtor's credit card to make personal purchases. The employee was an authorized user of the card. The court noted that the debtor did not pay the charges. The trustee sought to avoid and recover the charges from the employee under §§ 548 and 550(a)(1) as the entity for whose benefit the charges were made.

The court held, with very little analysis, that the concepts of "transfer" and "property" did not "encompass a circumstance in which a person . . . uses corporate credit for which the corporation itself does not pay." *Id.* at 915. Accordingly, the court held the transfers were not avoidable or recoverable.

---

[8] As with *Smith,* all of the above credit card cases were decided after *Begier.*
[9] Like *Smith, Montgomery* was a kiting case, albeit more complicated.

16

The court ignored that (a) the debtor exercised control over the credit card charges; (b) the "expansive" estate was diminished; and (c) the earmarking doctrine did not apply, because the debtor, not the credit card company, selected the vendors who were paid. The opinion is simply wrong. In addition, the court emphasized that the debtor did not pay the charges. While this is irrelevant, in this case I80 made numerous large monthly payments to each of the credit card companies. Undisputed Material Facts, ¶ 10.

    C.    <u>This Court has already ruled that I80 transferred its funds to Menard.</u>

This Court granted the Plaintiff's Motion for Partial Summary Judgment as to Menard's Third Affirmative Defense. Undisputed Material Facts, ¶ 12-13. This defense alleged that Menard was a subsequent transferee of the I80's funds. ¶ 11. This Court expressly ruled that Menard was the initial transferee, that it could not be a subsequent transferee and that there was no genuine dispute that I80 "transferred its funds to Menard . . ." *Id.*at ¶13. This ruling is law of the case and should not be revisited absent compelling reasons. *Minch v. City of Chicago,* 486 F.3d 294, 301 (7th Cir. 2007).

## IV. CONCLUSION

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that she be granted partial summary judgment in her favor and against Menard on her claim that I80 did transfer an interest of I80 in property, consisting of $707,322.95 of its funds, to Menard, and that Plaintiff be granted such other relief as is just.

.  
                                             Jeana K. Reinbold, solely as Chapter 7 Trustee of the Estate of I80 Equipment, LLC

                                             By: /s/ Andrew W. Covey  
                                             One of her attorneys  
                                             Andrew W. Covey  #06183817  
                                             403 S. French Drive  
                                             Dunlap, IL  61525  
                                             (309) 370-2692  
                                             Email: acovey1@hotmail.com

## PROOF OF SERVICE

I do hereby certify that I have caused to be served a copy of the foregoing Motion this day, by CM/ECF electronic filing as set forth below.

Dated:  October 16, 2024                    /s/ Andrew W. Covey  
                                                    Andrew W. Covey

By CM/ECF  
       Sonette Magnus smagnus@thompsoncoburn.com  
       W. Anthony Andrews wandrews@ottosenlaw.com  
       Joseph S. Davidson jdavidson@ottosenlaw.com