

First Midwest Bank
50 West Jefferson Street
Joliet, Illinois 60432-4399
(815) 727-5222

September 21, 2009

I80 Equipment
Attn Lois Estabrook
PO Box 132
Colona IL 61241

Congratulations! Your company has been approved for a First Midwest Bank Visa Corporate Credit Card.

Enclosed is a copy of the First Midwest Bank Business Card Agreement. We encourage you to read through this document so you can make yourself familiar with the terms and conditions of the First Midwest Bank Corporate Credit Card. Please keep this document for future reference.

Thank you for choosing First Midwest Bank.

Regards,

*Kevin P. Sinram*

Kevin P. Sinram
Vice President
Card Services Manager


EQUAL HOUSING LENDER

Member FDIC

FMB001064

# FIRST MIDWEST BANK
## COMMERCIAL CREDIT CARD AGREEMENT

This Agreement is between your company (the *"Company"*) and First Midwest Bank The Company desires to have First Midwest Bank issue Visa® Commercial Credit Cards (*"Cards"*) for use by the Company's employees and any other persons designated by the Company as authorized to receive and use a Card to charge purchases. First Midwest Bank desires to issue Cards and establish a credit card account for each Cardholder (a *"Cardholder Account"*), subject to the Company's agreement to be liable for all Card and Cardholder Account transactions and related interest, fees, and charges in accordance with this Agreement. By executing a Commercial Credit Card Application requesting First Midwest Bank to establish Cardholder Accounts, or by allowing any Card to be used by a Cardholder, the Company agrees as follows:

1. *Definitions.* In this agreement:

    a. *"Cardholder"* means the person whose name is embossed on a Visa® Commercial Card issued by First Midwest Bank
    b. *"Company"* means the organization that authorized First Midwest Bank, to issue the Card to Cardholder as an employee, authorized user or agent of that organization.
    c. *"Transaction"* means any purchase transaction effected through the use of the Card or Cardholder Account.
    d. *"We", "us" and "ours"* means First Midwest Bank

2. *Use of Cards.* Cards and Cardholder Accounts shall be used for purchase anywhere the Visa® Commercial Card is accepted. We are not responsible if any merchant, financial institution, or other person refuses to honor the Card. We reserve the right to deny authorization for any Card transaction.

The Company warrants to us that each individual for whom the Company shall request a Card shall be an agent or employee of the Company or of a subsidiary of the Company and shall have a business or commercial purpose for the Card. The Company agrees that the Cards are to be used for business purposes, and not for personal, family, or household purposes. Regardless of the purpose for which the Cardholder obtains credit through the use of a Card or Cardholder Account, the Company agrees to pay us for all such credit and related interest, fees, and charges. Any person authorized to use a Card will be expected to sign a Card and agree to the terms of this Agreement. **The Company must notify us at 1-800-221-5920 or by writing us at 50 West Jefferson St, Joliet, Illinois 60432, if the Company wants us to cancel or suspend any Cardholder Account due to termination of a Cardholder's employment or other reasons.**

1

At our request, the Company agrees to designate a person to administer the Commercial Credit Card program on its behalf, upon whom we may rely for all such purposes.

3. *Credit Limit.* We shall establish a total credit limit for all Cards and Cardholder Accounts (the *"Aggregate Credit Limit"*). A credit limit shall also be established for each individual Cardholder Account (the *"Individual Account Limit"*) as requested by the Company and approved by us. The Company agrees not to allow the Aggregate Credit Limit or the Individual Account Limit to be exceeded at any time. We may decrease the Aggregate Credit Limit and/or the Individual Account Limit for one or more Cardholder Accounts at any time, and shall give prompt notice thereof to the Company. If the Aggregate Credit Limit or Individual Account Limit is exceeded at any time, then the excess may be deemed immediately due and payable at our option.

4. *Periodic Statements.* We will send a monthly periodic billing statement to the Company in any month in which there is a debit or credit balance of $1 or more, (unless not otherwise required by applicable law), which shall be a consolidated statement for all Cardholder Accounts. This consolidation of the Cardholder Accounts for purposes of billing and calculating interest, fees, and charges is referred to as the "Company Account." In addition, we will send a monthly periodic memo statement to each Cardholder who had Card transactions during the monthly period. Unless the Company notifies us in writing within sixty (60) days of receipt, the Company statement will be conclusively deemed to be correct.

Alternately, a monthly statement can be sent to the individual cardholders for purposes of billing and calculating interest, fees and charges. A monthly memo statement can be sent to the company listing transactions of the individual cardholders.

Unless the Company notifies us in writing within sixty (60) days of receipt, the Company statement will be conclusively deemed to be correct.

5. *Payments.* If the new balance is paid in full each month the Company will have a grace period of at least 25 days from the consolidated billing statement closing date before a finance charge and late fee is imposed. To avoid a finance charge being applied to the Company's current charges on the next month's billing statement the Company must pay the new balance (the "Minimum Payment" on the consolidated billing statement) in full by the due date indicated on the statement. If the Company does not pay the new balance in full and chooses to pay the balance over time, (i) a late fee will be assessed; and (ii) finance charges will be computed on the average daily balance (including new purchases) of the Company Account, as described in this Agreement.

All payments made by mail should be by check or similar instruments drawn on a U.S. financial institutions in U.S. dollars. Payments received on a business day by the specified time

2

and at the payment processing location specified on the Company Account periodic billing statement will be posted as of the date of receipt. Our business days are Monday through Friday excluding federal holidays. Payments received on a non-business day may be processed on the next business day and finance charges will continue to accrue. Payments received after that time or at any other location may be delayed for crediting. *Any conditional check, money order or any other instrument tendered as full satisfaction of a disputed debt or as an accord and satisfaction or containing a restrictive endorsement (such as 'payment in full') must be sent to our address shown on the Company Account statement. The Company must note conspicuously on the face of that payment that it is tendered for that purpose. If the Company makes payment in any other way and we accept it, we will not have waived our right to collect any amount from the Company owing under this Agreement.*

Any check or money order may be returned to the Company without applying it to the Company Account for any reason. We have the right to determine at our option the order in which a payment will be applied toward purchases, interest, fees, and charges.

6. *Finance Charges.*

a. *Periodic Finance Charges.* Finance Charges on the Company Account begin to accrue on the transaction date of each purchase. However, the Company can avoid additional finance charges on purchases by paying the New Balance in full on or before the payment due date. In addition, there is no finance charge on purchases for any monthly billing period which has a zero previous balance.

In any billing period in which the Company Account is subject to finance charges, we will calculate finance charges on the Company Account by applying a monthly periodic rate to the Average Daily Balance (including current transactions for purchases). The Average Daily Balance for Purchases is determined by first taking the beginning balance of the Company Account each day, and adding any new purchases and subtracting any payments and credits applied that day. This gives us the daily balance for Purchases. Then we add all these daily balances for the billing cycle together and divide by the number of days in the billing cycle. This gives us the Average Daily Balance for Purchases.

The monthly periodic rate is determined by dividing the Annual Percentage Rate by twelve. The Annual Percentage Rate for a billing period will be determined by adding a margin of 6 percentage points to the Prime Rate published in *The Wall Street Journal* on the last business day of the previous calendar month. If more than one rate is published, we will use the highest of the published rates.

b. *Minimum Finance Charge.* The Company Account is subject to a minimum finance charge of one dollar ($1.00) for any billing period in which a finance charge is due.

7. *Fees and Charges.*

a. *Annual Card Fee.* None

b. *Late Charges.* A late charge of $20.00 will be charged to the Company Account if we do not receive at least the minimum monthly payment by the payment due date.

c. *Overlimit Fee:* A fee of $25.00 will be charged to the Company Account if the Company's Aggregate Credit Limit or any Cardholder's Individual Account Limit is over its credit limit when billed.

d. *Additional Card Fee:* A fee of $2.00 will be charged to the Company Account for each Card issued to the Company in addition to the first Card.

e. *Returned Payment Fee.* A returned payment fee of $15.00 will be charged to the Company Account each time the Company's check or other form of payment is returned unpaid for any reason.

f. *Lost Card Replacement Fee.* A fee in the amount of $5.00 will be charged to the Company Account whenever a new Card must be issued by us in replacement of any Card which has been lost or misplaced.

g. *Copying Charge.* The Company agrees to pay a copying charge of $2.00 per page copied to cover the cost of locating and duplicating Company Account documents including statements, sales slips, and checks requested by Company.

8. *Disputes with Merchants.* If the Company has any questions, problems or disputes concerning the quality of goods or services purchased by means of any Card or Cardholder Account, the Company agrees to contact the seller directly to resolve such question, problem or dispute and any such dispute shall not affect the obligations of the Company to us under this Agreement. The Company acknowledges that we are not liable for the quality of any such goods or services. The Company statement may include a description of certain billing error rights. These rights apply only to consumer credit accounts and do not apply to business accounts such as the Company Account.

9. *Unauthorized Use.* The term "Unauthorized Card Transactions" shall mean any use of a Card or the Cardholder Account that did not benefit the Company, was presented to us for authorization approval and which either (i) occurred and was authorized by us after we received

4

NON-REV
FMB001097

written notice from the Company to terminate the Card, (ii) was incurred by someone other than a Cardholder who had no actual, implied or apparent authority to use the Card or Cardholder Account and such transaction occurred after we received notice that the Card is in the possession of an unauthorized user, or (iii) occurred and was processed following receipt by us of notice of the loss or theft of the Card or the termination of any Cardholder's employment by the Company. The Company shall be liable to us for all use of Cards, including a lost or stolen card, that occurs within the parameters of the credit limit for which authorization is not requested or not required and all use of a Card which occurs before we are notified that such Card is lost, stolen or in the possession of an unauthorized individual. Except as provided in this section, a Card in the possession of an individual to whom a Card is issued or who was authorized by the Company to use the Card shall not be considered lost or stolen or in the hands of an unauthorized person and the Company continues to be responsible and liable to us for the use of such a Card until it is returned to us or authorization is blocked by us.

Notwithstanding the foregoing, if fewer than ten (10) cards are issued and outstanding under this Agreement, the Company's liability for such Unauthorized Card Transactions will not exceed $50.00 per Card. It is the Company's responsibility to immediately notify us of the loss, theft or possible unauthorized use of the Company Account. Please note the telephone number and address that are printed on the Company's monthly statement for this purpose. If an Unauthorized Card Transaction appears on the Company's monthly statement, the Company must send us written notice explaining the error and reasons for believing that it is an Unauthorized Card Transaction. If the Company reports or we suspect unauthorized use of the Card or Cardholder Account, we may suspend credit privileges until we resolve the matter to our satisfaction, or until we issue the Company a new Card.

10. *Card Transactions in Foreign Currencies.* If the Company or a Cardholder conducts a transaction in other than U.S. Dollars, Visa® will convert the amount of the charge in foreign currency into a U.S. Dollar amount. To make this conversion, Visa® will use the procedure set forth in its operating rules using either 1) a rate selected by Visa® from the range of rates available in wholesale currency markets or 2) a government-mandated rate in effect on the day Visa® processes the transaction. The rate in effect on the processing date may differ from the rate on the date the Company or Cardholder used the Card. Visa® will add 1% to this amount and we will add 2% to this amount (3% Foreign Currency Conversion Fee). The Company or Cardholder agrees to pay the U.S. Dollar amount converted from a foreign currency as provided in this section.

11. *Representations and Warranties.* Until this Agreement is terminated and we are repaid in full, the Company makes the following representations and warranties. Each request for an additional Card constitutes a renewed representation.

    a. In each state in which Company does business, it is properly licensed and in good standing.

5

    b. All financial statements which the Company furnishes to us are correct and complete and truly represent the financial condition of the Company, and that there has been no material change in the property, financial condition, or business operations of the Company.

    c. The Company is not currently in default under any agreement or order which adversely affects the Company property, financial condition, or business operations in a material manner.

    d. No information, exhibit, or report that has been or will be furnished by the Company to us contains any material misstatement of fact as of the date when made, or omits some material fact necessary to make the statements contained therein not misleading as of the date when made.

    e. There is no lawsuit, tax claim or other dispute pending or threatened against the Company which, if lost, would impair the Company's financial condition or ability to repay this credit, except as have been disclosed in writing to us.

    12. *Periodic Credit Review.*

    a. The Company promises that it shall (i) maintain a standard and modern system for accounting in accordance with generally accepted accounting principles consistently applied throughout all accounting periods and consistent with those applied in the preparation of the financial statements the Company has provided to us, (ii) furnish to us such information respecting the business, assets, and financial condition of the Company as we may reasonably request, and (iii) notify us in writing immediately of any changes in name, business name, mailing address or day-time phone number of the Company, principals or Cardholders, or any material adverse change to the Company's financial condition.

    b. The Company agrees that we may confirm any information which the Company provides to us. The Company authorizes us to make or obtain any credit or other inquiries we deem appropriate for the extension of credit, determination of credit limits or collection of amounts owed on the Company Account, and to furnish such information or information concerning the Company Account or credit history with us to consumer reporting agencies, Company references our affiliates and others who may properly receive that information. The Company affirms that it has the written authorization on behalf of the Company and its owners and officers to and does authorize us, in our discretion, to investigate personal credit and trade references and obtain a consumer report for owners or officers of the Company at the time the Company applies for the Company Account and at any time thereafter.

NON-REV
FMB001099

*13. Termination.* This Agreement shall remain in effect until terminated by us or the Company at any time upon providing written notice to the other party. If either party terminates this Agreement, the Company shall immediately cut in half all Cards issued and return them to us. Termination shall not affect the Company's liability for any purchases, advances, interest, fees, and charges pursuant to this Agreement. Following termination, (a) all provisions of this Agreement shall remain in force until the Company's liabilities have been paid in full in accordance with the terms and conditions of this Agreement and (b) the Company agrees that we are not obligated to authorize any additional charges on Cardholder Accounts, but if any Card transactions do occur, the Company remains liable therefor pursuant to this Agreement.

14. *Default and Acceleration.* We may, by notice to the Company, immediately terminate this Agreement, cancel any or all Cardholder Accounts, and/or declare the outstanding principal balance of the Company Account together with all interest, fees, and charges accrued thereon to be immediately due and payable by the Company if:

   a. Any minimum payment or other amount due on the Company Account shall remain unpaid for 30 days after the same becomes due;
   b. The Company or any guarantor of the Company's obligations hereunder (a *"guarantor"*) shall default in the performance or observance of any of the agreements, covenants, conditions, provisions, or terms of this Agreement, any guaranty, or any security agreement securing this Agreement;
   c. Any representation or warranty made by the Company or any guarantor to us or in any financial statement delivered by the Company or any guarantor to us shall prove to have been false in any material respect as of the time when given;
   d. The Company or any guarantor shall fail to pay or perform as agreed under any other agreement the Company or any guarantor has with us or any of our affiliates;
   e. There is a direct or indirect change in ownership of the Company in excess of 25% in the aggregate after the date of the Company's application for this Card program;
   f. The occurrence of the death of any owner, if Company is a sole proprietorship; the death of any general partner, if the Company is a partnership; or the death of any majority shareholder, if the Company is a corporation;
   g. The occurrence of a material adverse change in the Company's or any guarantor's financial condition, properties or prospects or ability to repay this credit;
   h. Any guarantor terminates, repudiates, or disavows its guaranty or any part thereof; or
   i. any judgment, writ, or warrant of attachment or any similar process shall be entered or filed against the Company or any guarantor or against any of their respective property, and which remains unvocated, unbonded, unstayed, or unsatisfied for a period of 30 days.

In addition, this Agreement shall immediately terminate without notice and the outstanding principal balance of the Company Account (evidencing the consolidated balance of the Cardholder Accounts), together with all accrued interest, fees, and charges, shall be immediately due and payable by the Company in the event of the Company's or any guarantor's insolvency, receivership, or voluntary or involuntary bankruptcy or similar proceeding.

7

NON-REV
FMB001100

In the event of any acceleration pursuant to this Section 14, and to the extent permitted by applicable law, the Company authorizes us to set off against the amount due any funds of the Company on deposit with us or any of our affiliates. In the event that either party breaches or violates any of the obligations of this Agreement, the other party shall be entitled to exercise any right or remedy available to it at law or in equity, including damages and injunctive relief, but not including special, incidental, consequential, or punitive damages. The exercise of any remedy shall not preclude the concurrent or subsequent exercise of any other right or remedy, and all rights and remedies shall be cumulative.

15. *Limits on Liability and Force Majeure.* In the event the Company makes a claim against us for loss or damage allegedly suffered by the Company because of the acts or omissions of us in connection with the Company Account or use of a Card, the Company agrees to indemnify and hold us harmless from such claims, unless such acts or omissions resulted from our gross negligence or willful misconduct. In no event will we be responsible for any special, indirect, consequential or punitive damages, including but not limited to lost profits.

We shall not incur any liability for any failure or delay in carrying out any of our obligations under this Agreement if such failure or delay results from us acting in accordance with applicable laws or applicable Visa association rules and regulations, or from acts of God, strike or stoppage of labor, power failure, system, network, or equipment failure, adverse weather conditions or any other cause beyond our control. We shall have no responsibility and shall incur no liability for any act or failure to act by any other financial institution, credit card association, or any other third party.

16. *Indemnities.* The Company agrees to indemnify and hold us, Visa® credit card association, and our subcontractors and agents harmless from and against any and all actions, claims, demands, loss, liability or expenses whatsoever, including attorneys' fees and arbitration costs, resulting directly or indirectly from (i) the Company's breach of any of its representations, warranties, or covenants under this Agreement, or our enforcement of any of its rights or remedies under or pursuant to this Agreement, (ii) our compliance with or carrying out any instruction or request which identifies the Company as sender, if such instruction or request is accepted by us in good faith, (iii) our actions or omissions in performing services in connection with this Agreement unless such actions or omissions are determined to result from our gross negligence or willful misconduct, (iv) our good faith refusal to approve any Card transactions, or (v) any disputes or legal actions by Cardholders regarding the use of the Cards or the Cardholder Accounts.

17. *Arbitration.* Any claim, dispute or controversy however characterized whether past, present or future (*"Claim"*) arising out of or relating to this Agreement, the relationships established by this Agreement or any other document related to this account other than collection of amounts due to us under this Agreement or our right to foreclose on any collateral related to the Company Account or exercise of rights of set off; including the validity and enforceability of this arbitration clause or any part of this Agreement, shall be resolved by binding arbitration (elected by either party) pursuant to this provision and the Code of Procedure of the National Arbitration Forum in effect at the time the Claim is filed. Any such election may be made at any time, regardless of whether a lawsuit has been filed or not, unless such a lawsuit

resulted in a final judgment. Copies of the procedures and forms of the National Arbitration Forum may be obtained by calling 1-800-474-2371. A Claim may be filed at any National Arbitration Forum office. If for any reason the National Arbitration Forum is unable or unwilling or ceases to serve as arbitration administrator, an equivalent national arbitration organization utilizing a similar code of procedure will be substituted by us. Unless inconsistent with applicable law, each party shall bear the expense of their respective attorneys, experts and witness fees regardless of which party prevails in the arbitration. This arbitration provision is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16. This arbitration provision shall survive repayment of the Company Account and termination of this Account. If any portion of this arbitration provision is deemed invalid or unenforceable under the Federal Arbitration Act, it shall not invalidate the remaining portion of this arbitration provision. The arbitration will be conducted in Cook County, Illinois. Any Claim submitted to arbitration shall be limited to no more than actual, compensatory, economic damages plus, in the arbitrator's discretion, punitive damages of no more than two times such actual damages or $10,000, whichever is lesser. Judgment upon the award may be entered in any court having jurisdiction. **THE PARTIES ACKNOWLEDGE THAT WITHOUT THIS PROVISION THEY HAVE A RIGHT TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE OR JURY AND/OR PARTICIPATE OR BE REPRESENTED IN COURT BY OTHERS, BUT THAT THEY PREFER TO HAVE AN ELECTION TO RESOLVE ANY CLAIMS THROUGH ARBITRATION AND THAT THEY HEREBY WAIVE THEIR RIGHTS TO LITIGATE CLAIMS IN A COURT UPON ELECTION OF ARBITRATION BY EITHER PARTY INCLUDING ANY RIGHT TO A JURY TRIAL. ALL SUCH CLAIMS ARE TO BE RESOLVED THROUGH ARBITRATION.**

*18. Collection Costs/Attorney's Fees.* To the extent permitted by applicable law, the Company agrees to pay all collection costs and disbursements, including reasonable attorney's fees and court costs, incurred by us or any transferee, purchaser or assignee in collecting or enforcing this Agreement. We can bill these costs to the Company Account as a purchase.

*19. Telephone Monitoring.* The Company authorizes account servicing personnel to listen to and record all telephone calls between us and any person acting on the Company's behalf. The Company assumes the duty of obtaining the required consents from its agents and employees for this monitoring.

*20. One Agreement.* This Agreement is the entire contract which applies to the subject matter of this Agreement. We may rely on a telefacsimile copy of the Business Credit Card Application signed by an authorized representative of the Company to evidence the Company's acceptance of this Agreement, and the Company agrees that such copy shall be deemed to be an original counterpart for all evidentiary purpose. No delay or omission by us in exercising rights hereunder shall impair such rights or be construed to be a waiver thereof. No waiver or modification of our rights of this Agreement shall be valid unless written and signed by us and delivered to the Company and then only to the extent set forth therein. Any commitment of us under this Agreement shall be solely for the benefit of, and may not be assigned by, the Company. This Agreement shall inure to the benefit of us and our successors and assigns.

*21. Amendments.* This Agreement may be amended by us giving written notice to Company not less than fifteen (15) days prior to the effective date of the amendment or fifteen

NON-REV
FMB001102

(15) days prior to the beginning of the billing cycle within which said amendment will become effective, whichever is the earlier date. Any such amendment shall, at our option be applicable to both existing balances and future transactions. Unless the Company terminates this Agreement prior to the effective date of any amendment, the Company is deemed to have agreed to said amendment. Otherwise, any other amendment to this Agreement shall require our written agreement.

*22. Notices.* Except as otherwise provided herein, any notice or other communication to be given under this Agreement shall be in writing, delivered either by hand, facsimile transmission or U.S. first class mail, postage prepaid, addressed to the party to whom the notice is to be given at the address shown in the Business Credit Card Application, or at such other address as either party may designate in writing to the other. Any notice to us shall be effective when it is actually received and we have had a reasonable time to act on such notice. Any notice to the Company shall be effective when deposited in the U.S. mail, postage prepaid, or when deposited with a recognized courier or when actually received by telefacsimile. We may rely on facsimile transmissions of notices and other communications as though they are originals.

*23. Governing Law.* This Agreement and the rights and duties of all parties under this Agreement shall be governed by and interpreted in accordance with federal law and the laws of Illinois. For the purpose of legal action to enforce payment obligations under this Agreement, the Company hereby irrevocably submits to the non-exclusive jurisdiction of the courts of the State of Illinois and the United States of America for the Northern District of Illinois, and agrees that any legal action or proceeding with respect to this Agreement may be commenced in such courts.

10

NON-REV
FMB001103