SIGNED THIS: February 28, 2025

_____
**Peter W. Henderson
United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: | |
| I80 EQUIPMENT, LLC, | Case No. 17-81749 |
| Debtor. | |
| JEANA K. REINBOLD, Chapter 7 Trustee, | |
| Plaintiff, | |
| vs. | Adv. No. 19-8110 |
| MENARD, INC., | |
| Defendant. | |

OPINION

The Chapter 7 Debtor paid for goods at Menards, a home improvement store, for the benefit of non-debtor entities. In each transaction, an agent of the non-debtor entity

would pick out goods, take it to the cash register, use the Debtor's credit card (which he was authorized to use), and then take the goods out of the store for use by the non-debtor entity. The Trustee alleges both actual and constructive fraud and seeks to recover from Menard, Inc., all payments the Debtor made. Menard moves for summary judgment because it took the money in good faith and gave value. 11 U.S.C. §548(c). The Trustee counters that value must be given to the debtor under §548(c), and Menard gave value to non-debtor entities, not the Debtor. The Trustee thus cross-moves for summary judgment that §548(c) does not apply.

Menard is entitled to judgment in its favor. Fraudulent conveyance law looks to substance, not form. In substance, in exchange for contemporaneous payment, Menard gave value to the Debtor's designee, the non-debtor entities, meaning it gave "value to the debtor" for purposes of §548(c). Or, to think of it another way, the Debtor bought goods from Menards that it gratuitously transferred to the non-debtor entities. Assuming that the transfers were fraudulent, the Trustee may recover only from the non-debtor entities, not Menard, because Menard gave value to the Debtor.

I.      Jurisdiction

This Court has jurisdiction over "any or all proceedings arising under title 11 or arising in or related to a case under title 11" under 28 U.S.C. §157(a) and ILCD LR 4.1. A proceeding to recover fraudulent conveyances is a core proceeding under Title 11. 28 U.S.C. §157(b)(2)(H). The parties have consented to the entry of final judgment by the Court. The Court has constitutional and statutory authority to hear the case. *In re Horizon Group Management, LLC*, 617 B.R. 581, 585 (Bankr. N.D. Ill. 2020).

II.     Background

The Court shall grant summary judgment to the moving party that shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056, incorporating Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion will be granted. *Indiana Green Party v. Morales*, 113 F.4th 739, 744 (7th Cir. 2024). With all reasonable inferences drawn in favor of the Trustee, the record establishes the following undisputed facts:

### A. Erik Jones fraudulently transfers value from the Debtor to his other companies.

In 2016 and 2017, Erik Jones defrauded First Midwest Bank to the tune of millions of dollars by obtaining loans for his company, I80 Equipment, LLC (the Debtor, I80), through false pretenses. Jones then laundered the loan proceeds by using them to pay off previous creditors of I80. The fraud was unsustainable; I80 filed a Chapter 7 bankruptcy petition in late 2017, and Jones was later convicted of bank fraud and money laundering. He will report to federal prison later this year to begin serving a 54-month sentence. *United States v. Jones*, No. 20-CR-40056 (C.D. Ill.).

I80, which Jones solely owned, bought and refurbished bucket trucks for resale. Jones also solely owned two other LLCs: Jones Lease Properties (JL), which rented and managed single-family and multi-family residences; and J.P. Rentals (JP), which rented commercial, multi-unit properties.

By December 2015—two years before I80's bankruptcy—I80 had a credit card issued by First Midwest Bank with a $300,000 credit limit. From at least March 2016 through December 2017, I80 also had a credit card issued by U.S. Bank with a credit limit of at least $450,000. JL and JP, by contrast, acquired credit cards beginning only in January 2017, and those cards had a $50,000 credit limit.

I80 authorized agents of JL, JP, or Jones (collectively, the "Jones entities") to use I80's credit cards for the sole and limited purpose of making retail payments to the Defendant, Menard, Inc. It did so because JL and JP either had no credit cards or had insufficient credit. In the two years before I80 filed its bankruptcy petition, I80 paid Menard a total of $707,242.49 by credit card at Menard's stores in Illinois and Iowa for goods that were intended for use by the Jones entities. Each time I80 paid for goods intended for JP, I80 recorded the transaction in its general ledger in Account 11001. Transactions for JL's benefit were recorded in Account 11002 and those for Jones's benefit in Account 30700. (I80 also paid for merchandise for its own use; those payments were recorded in a separate expense account, and the Trustee does not seek to avoid them.) I80 was careful in accounting for the Menard transactions; when an individual in one purchase bought goods for both I80 and JL, I80 partly recorded the purchase in Account 11002 and partly recorded the purchase in its own expense account. For their part, JL and JP recorded the purchases in their own liability accounts. None of these entries reflected actual accounts receivable or payable, though; JL and JP never paid I80 back.

3

Take one of the sales, for illustration. Kevin Bohannon went to the Menards store in Moline, Illinois on May 27, 2016. He bought a ceiling fan, a towel bar, a towel ring, plumbing supplies, and other items not likely to be used to restore bucket trucks but relevant to maintaining rental properties. He paid $883.49 for the goods by charging it to a Visa card in the name of Equipment VI/I80. Doc. #116-20 at 2–4. On I80's general ledger, a debit for $883.49 spent at Menards on 5/27/2016 appears in Account 11002, which is named "Due from Jones Lease Properties, LLC." Doc. #116-46 at 170. And in JL's ledger, a credit of $883.49 appears in the liability account for purchases at Menards on 05/23/2016 [sic]. Doc. #116-191 at 3. The ledgers do not contain any offsetting credits or debits; there is no evidence JL ever paid I80 back for the $883.49 purchase.

For each transaction at Menards, a cashier processes payment in the form of either credit card, debit card, check, or cash. A retail price must be paid before the goods are taken from a Menards store. None of the cashiers, front-end managers, or store general managers at any of Menard's locations are directed to ask a guest what the guest's intentions are with respect to the goods purchased. Nor did they have any reason to believe that the transactions at issue here involved any type of fraudulent scheme or were for the benefit of third parties. Apart from the sales transactions themselves, Menard did not enter into any contracts or agreements with I80 or its agents or affiliates. I80 never told Menard how the goods were to be used, nor did it direct Menard to deliver goods to the Jones entities. On occasion, goods that had been purchased using I80's credit cards were returned, and Menard issued a refund to the I80 credit card.

Of the many transactions the Trustee seeks to avoid, all but one involved the use of I80's credit cards. The exception is a $80.46 purchase on April 6, 2016. It is not clear if that was a debit card or cash purchase. I80's general ledger shows a credit of $80.46 to Account 1050 ("Petty Cash") corresponding to the April 6 transaction. (Doc. #116-46 at 108.) A debit in the same amount was accounted for in Account 11002 (Doc. #116-46 at 169), and no evidence shows it was repaid by JL.

### B.     The Trustee sues to recover the value of the fraudulent transfers.

After I80 filed its Chapter 7 bankruptcy petition, attorney Jeana Reinbold was appointed as Trustee. She filed several dozen lawsuits seeking to avoid I80's transfers in an effort to claw back some of I80's lost value for the benefit of its creditors. She settled with other large retailers, including Wal-Mart (Case No. 19-8122; I80 had paid Wal-Mart about $33,000 for goods used by the Jones entities); Home Depot (No. 19-8103; $6,000); and Lowe's (No. 19-8108; $43,000). The Trustee also sued JL (No. 19-8128), JP (No. 19-8129), and Jones (No. 19-8130), and recovered $125,000 in a global settlement of those

4

cases. Menard is the last holdout, the victim of its own success as the operator of Jones's apparently preferred home improvement store, Menards. As noted above, the Trustee seeks to recover over $700,000 from Menard.

The Trustee's two-count complaint alleges that I80's payments to Menard were both actually fraudulent (Count 1), §548(a)(1)(A), and constructively fraudulent (Count II), §548(a)(1)(B). After the Court denied Menard's motion to dismiss (Doc. #28), Menard answered the complaint (Doc. #30) and asserted, as an affirmative defense, that it was a good-faith transferee (Doc. #52). The Court later granted partial summary judgment to the Trustee on two separate issues, finding that the transfers at issue involved interests of the Debtor in property (Doc. #165) and that Menard was an initial, not subsequent, transferee (Doc. #107). The parties have now cross-moved for summary judgment on Menard's affirmative defense that it was a good-faith transferee who took for value under §548(c).

## III. Discussion

This case presents a vexing question under 11 U.S.C. §548(c) that has "no facile answer." Kenneth C. Kettering, *The Uniform Voidable Transactions Act; or, the 2014 Amendments to the Uniform Fraudulent Transfer Act*, 70 Bus. Law. 777, 817–19 (Summer 2015). On one hand, creditors are generally entitled to recover assets that were fraudulently transferred away from the debtor's estate. On the other hand, good-faith transferees who gave value to the transferor are generally not liable. In most situations, section 548 of the Bankruptcy Code clearly reflects those two aspects of longstanding fraudulent conveyance doctrine. But there is a "statutory anomaly." Ralph Brubaker, *On Constructively Fraudulent Transfers and Good Faith Transferees*, 39 Bankr. L. Letter No. 5 (2019). Because the Code envisions a series of two-party transactions, it fails to precisely articulate the rights of parties in a three-party transaction. Robert K. Rasmussen, *Guarantees and Section 548(a)(2) of the Bankruptcy Code*, 52 U. Chi. L. Rev. 194, 203–05 (1985).

The awkwardness lies in the requirement under §548(c) that a good-faith transferee give value *to the debtor*. Menard took for value (it sold retail goods at market prices) and in good faith. Were these two-party transactions with the Debtor, Menard would clearly be protected. These sales involved three parties, though, and the Trustee stands on the literal language of §548(c) to say that Menard did not give value to the Debtor, I80, when the Jones entities took the goods.

Under a proper understanding of §548(c), though, Menard did give value to the Debtor. Menard's transfer of goods must be viewed in the Code's two-party

5

paradigm—either as a transfer from Menard to I80's designee (a Jones entity), or as the first of two separate transfers: from Menard to I80, and then from I80 to a Jones entity. Either way, Menard gave value to I80. The Court holds that, under §548(c), a merchant gives value to the debtor when the debtor pays for goods in a present sale, even if those goods are received by a third party.

### A.  Fraudulent transfers, generally

The law of fraudulent conveyances confers upon a trustee in bankruptcy the right to disregard a fraudulent conveyance of the debtor and treat the affected asset as though the transfer had not been made. 1 Garrard Glenn, Fraudulent Conveyances & Preferences §3 (rev. ed. 1940). The Seventh Circuit explains:

> The original rule, in 13 Eliz. ch. 5 (1571), dealt with debtors who transferred property to their relatives, while the debtors themselves sought sanctuary from creditors. The family enjoyed the value of the assets, which the debtor might reclaim if the creditors stopped pursuing him. In the last 400 years the principle has been generalized to address transfers without either sufficient consideration or bad intent, for they, no less than gifts, reduce the value of the debtor's estate and thus the net return to creditors as a group. The trustee reverses, for the benefit of all creditors, un- or under-compensated conveyances within a specified period before the bankruptcy.

*Bonded Financial Servs., Inc. v. European American Bank*, 838 F.2d 890, 892 (1988). Both actually fraudulent transfers and "constructively" fraudulent transfers may be undone. "A birthday gift of cash by an insolvent debtor injures creditors just as much when his intentions are innocent as when they are not." Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand. L. Rev. 829, 832 (1985).

Returning a gift is unpleasant, but hardly inequitable when the gift came at a creditor's expense. Not all transfers are gifts, though. An innocent transferee who gives value for the transfer is differently situated from a gift recipient. Good-faith transferees have been protected from giving back property since the Statute of 13 Elizabeth itself. 1 Glenn, *supra*, §§226, 235. The innocent transferee "is entitled to submit in his own behalf, the obvious reason that he has not, like a mere general creditor, trusted to the personal responsibility of the debtor, but has paid the consideration upon the faith of the debtor's actual title to the specific property transferred." *Id*. §235 (cleaned up). Both the common law and modern statutes reflect that principle.

At its core, fraudulent conveyance doctrine is a flexible principle that looks to the substance of a transfer, rather than its form. *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009). The law protects creditors from last-minute diminutions of the pool of assets in which they have interests. *Bonded*, 838 F.2d at 892. It efficiently allocates the costs of monitoring: because the trustee may avoid and recover gratuitous transfers that diminish a debtor's pool of assets, creditors need not scrutinize every transaction the debtor makes to protect their interests. *Id*. Similarly, because the doctrine recognizes the rights of innocent transferees, third parties operating at arm's length need not scrutinize a debtor's financial condition to have confidence that their transactions, for value and in good faith, will not be second-guessed. *Boyer*, 587 F.3d at 793. A third party transacting with the debtor at arm's length will be protected even if the debtor's improvidence leaves its other creditors in the lurch. See *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 681 (Bankr. S.D.N.Y. 2000).

### B. The statutory text

Section 548 is the modern iteration of fraudulent conveyance law in the Bankruptcy Code. It authorizes the trustee to avoid any transfer of an interest of the debtor in property within 2 years before the petition is filed, if the debtor

> (A) made such transfer … with actual intent to hinder, delay, or defraud any entity to which the debtor was … indebted; or
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer …; and
>
> (ii) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer ….

11 U.S.C. §548(a)(1). Subsection (A) addresses "actual" fraud, and subsection (B) addresses "constructive" fraud. For both types of fraud, a transferee

> that takes for value and in good faith has a lien on or may retain any interest transferred … to the extent that such transferee … gave value *to the debtor* in exchange for such transfer ….

11 U.S.C. §548(c) (emphasis added).

Generally, the trustee may recover for the benefit of the estate the property transferred, or its value, from

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. §550(a). Anyone defined by paragraph (2) is known as a "subsequent" transferee. The trustee may not recover from a subsequent transferee if it

takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided.

11 U.S.C. §550(b)(1).

The Code thus distinguishes between initial transferees and subsequent transferees. It does so in a linear way, imagining a chain of two-party transactions. "Transferees and other purchasers generally deal only with the previous person in line; they give value, if at all, to their transferors (or the transferor's designees)." *Bonded*, 838 F.2d at 897. An initial transferee wishing to avail of itself of the good-faith, for-value defense generally must show that it gave value to the debtor, §548(c), because the debtor is necessarily the previous person in line: only transfers of an interest in property of the debtor are avoidable. *Mann v. LSQ Funding Group, L.C.*, 71 F.4th 640, 646 (7th Cir. 2023). A subsequent transferee, by contrast, need not give value to the debtor, because it is dealing with a subsequent transferor, not the debtor. §550(b)(1). "[V]alue to the transferor" or its designee is thus sufficient. *Bonded*, 838 F.2d at 897.

### C. Illustrating the problem

It may be easier to understand how each of the statutory provisions work by imagining several variations on the facts of this case. For simplicity's sake, let us use people, rather than corporations acting through agents: Ian for I80, and John for the Jones entities. Assume that each transfer below is actually fraudulent, *i.e.*, is made with the intent to hinder, delay, or defraud Ian's creditors. §548(a)(1)(A). Our focus is on each party's liability.

*Scenario 1.* Ian buys a $100 ceiling fan at Menards. He then gives the fan to John. In Ian's later bankruptcy, the $100 payment to Menard is not recoverable, because Menard gave value (a $100 fan) to Ian. §548(c). The fan (or its value) may be recovered from John, though, because the second transfer was gratuitous. §550(a)(1).

*Scenario 2.* Ian gives John $100. John uses the money to buy a fan from Menards. The trustee may recover $100 from John, the initial transferee. §550(a)(1). Menard, though a subsequent transferee of the $100, is not liable to repay the money because it gave value to John, a subsequent transferor, in good faith. §550(a)(2), (b)(1).

In each scenario, the trustee may avoid the fraudulent transfer and recover from the party that received a gratuity, thus restoring the status quo ante. The substance of the transfer is always the same: Ian gives John $100 in value. To undo the transfer, John must return the $100 gift. Though Menard participated in each transfer of value, it is not liable to return the money because it took in good faith and for value. The form of the transfer does not matter. So far, so good.

Now consider the Trustee's theory:

*Scenario 3.* John goes to Menards to buy a ceiling fan and brings Ian with him. John picks out the fan, takes it to the register, and places it on the first conveyor belt. The cashier scans the fan and places it on the second conveyor belt for John to pick up. Ian hands the cashier $100 to pay for the fan. John walks out with the fan.

According to the Trustee, Menard gave value to John, not Ian (the debtor), so §548(c) is not applicable. Menard was the initial transferee of the $100, so §550(b) does not help Menard. The Trustee may therefore recover from both Menard, the initial transferee, and from John, the beneficiary of the transfer. §550(a)(1). Or so the statutory text would seemingly command.

The literal application of §548(c) in Scenario 3 makes no sense as a matter of fraudulent transfer doctrine, though. It violates the ancient principle that a good-faith transferee who gives value will be protected. 1 Glenn, *supra*, §235. It contradicts the assurance the doctrine gives to third parties that transactions done with the debtor at arm's length will not be second-guessed. *Boyer*, 587 F.3d at 793. It imposes unreasonable costs on merchants that have limited ability to monitor debtors. See *Bonded*, 838 F.2d at 892. Rather than restore the status quo ante, it places Menard in a worse position than it

9

would have been in had the transfer never happened. Rasmussen, *supra,* 52 U. Chi. L.R. at 203. So while Scenario 3 literally proceeds through the statutory text, it does not produce the correct result under the law. Cf. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("In equity, substance will not give way to form, and technical considerations will not prevent substantial justice from being done.") (cleaned up). The fact that Menard gave value in exchange for Ian's payment ought to afford Menard protection.

### D. Solving the problem

As a matter of fraudulent conveyance law, Menard should not be liable for Jones's fraud. Menard was an innocent merchant who gave value for I80's money. Courts have addressed variations on this problem for years. They mostly agree, with some exceptions, that a merchant is not liable under §548 to pay back the money it received in a normal commercial transaction.[1] *Plotkin v. Pomona Valley Imports (In re Cohen)*, 199 B.R. 709 (B.A.P. 9th Cir. 1996); *Peterson v. TTS Granite Inc. (In re Mack Industries, Ltd.)*, 622 B.R. 887 (Bankr. N.D. Ill. 2020); *Trauner v. Delta Air Lines, Inc. (In re Think Retail Solutions, LLC)*, No. 17-5078, 2019 WL 2912717 (Bankr. N.D. Ga. 2019); *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.)*, No. 10-3005, 2011 WL 2182881 (Bankr. S.D. Fla. 2011).

Two related approaches support judgment in favor of Menard. Both give effect to §548's paradigm that treats transfers as taking place between two parties. *First*, under *Bonded*, Menard gave value to the debtor by providing the goods in a present sale to the debtor's designee. Viewing each sale as a single, two-party transaction, both I80 and the Jones entity were on the same side of the transaction. When Menard gave value to that side, it gave value to the debtor for purposes of §548(c). *Alternatively*, I80's transfer of value may be recharacterized as two two-party transactions: (1) the transfer of I80's money in exchange for goods from Menard, and (2) the transfer from I80 to JL, JP, or Jones of the goods. See Rasmussen, *supra*, 52 U. Chi. L.R. at 207.

---

[1] *White v. Kar Smart of Lexington, Inc. (In re Cambridge Capital Group, Inc.)*, No. 06-10011, 2009 WL 3823185 (Bankr. D.D.C. 2009), upon which the Trustee relies, is one such exception. This Court does not find the rationale of *Cambridge Capital Group*, which concerned payment for a car previously bought on eBay, to be persuasive or entirely apposite. Closer is *Brandt v. Charter Airlines, LLC*, No. 14 C 5102, 2015 WL 4764145 (N.D. Ill. 2015), which denied an airline's motion for summary judgment when a corporation paid the airline for tickets used by its officers. *Brandt* was wrongly decided based upon a literal reading of §548; the bankruptcy judge had rightly recommended that summary judgment be granted under §548(c), 511 B.R. 527, 537 (Bankr. N.D. Ill. 2014).

10

The theoretical framework does not ultimately matter for this case; it is the substance of the transfers, not their form, that controls. In substance, I80 gratuitously transferred value to the Jones entities, who were in on the fraud. It did not gratuitously transfer value to Menard, who was not. The Trustee may recover only from the Jones entities, not Menard.

### 1. Menard gave value to the Debtor (or its designee).

The Court has already found that Menard was an initial transferee of an interest of the debtor in property. Docs. ##107, 165. Remember that Menard is the initial transferee of I80's funds because, under the dominion and control test of *Bonded*, we disregard intermediaries:

> Just as we do not treat the cashier as the initial transferee (for she does not exercise dominion and control over Menard's funds), so too do we not treat an authorized user of the corporation's credit card accounts as an initial transferee (for he in his personal capacity does not exercise dominion and control over the Debtor's funds).

Doc. #107 at 3–4 (citing cases). The same principle informs the proper view of our tripartite transaction. Only one party—I80—controlled the transaction. The material fact, which is undisputed, is that Menard insists on contemporaneous payment; "a retail price must be paid before the goods may be taken" from Menard's stores. Menard was not willing to sell any goods to the Jones entities alone, for the simple fact that they did not propose to pay for them. Menard did not give away its goods or sell on credit.

So I80 was in charge. If it did not pay, there was no transaction. If it disagreed with a purchase proposed by a Jones entity, the purchase was not made. Both I80 and the Jones entities relied on the same agent (and therefore colluded to have I80 buy goods for the Jones entities), but I80 was not merely a source of payment that did not receive value. Like a parent buying her child a candy bar at the register, I80 was the party transacting with Menard, regardless of who picked out or ultimately ate the candy bar. I80 had "the exclusive power to designate the persons to whom the [goods] would be delivered." *Cohen*, 199 B.R. at 715. For the purposes of §548, which looks to substance, not form, I80 bought the goods, because Menard only sold goods to customers who paid for them.

I80 did not receive the goods under the Trustee's theory. But by authorizing agents to use its credit card to pay for goods for the Jones entities, I80 necessarily designated that one of those entities could receive the goods. Cf. UCC §2-210(1). *Bonded*

11

refers to the "previous person in line" as either the transferor *or* the transferor's designee for the purposes of the value defense. 838 F.2d at 897. The previous person in line for an initial transferee is necessarily the debtor. Menard's liability does not turn on its compliance with the Debtor's designation of (or acquiescence in) another entity receiving the goods. It is entitled to let the child take the candy bar off the conveyor belt even though the parent, not the child, paid. Menard gave value to the person I80 designated, so it is entitled to protection as an unwitting trading partner under Section 548(c):

> The provision looks at value from the perspective of the transferee: How much did the transferee "give"? The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain.

*In re Hannover Corp.*, 310 F.3d 796, 803 (5th Cir. 2002); accord *Phoenix Diversified Inv. Corp.*, *supra*, 2011 WL 2182881, at *5. Menard had no interest in what I80 did with the merchandise or who picked it up from the conveyor belt. It insisted only that the retail price for goods be paid. In return for I80's payment, Menard gave value to I80 by delivering goods to whomever it designated or permitted to receive the goods. Section 548(c) treats that as "value to the debtor" from the transferee's perspective.

"Avoidance law is not only about creditors' interests. It is also about transferees' interests." Kettering, *supra*, at 818. The undisputed facts here establish that one person (Bohannon, for example) brought goods to the register. The same person paid for the goods. The same person then took the goods out of the store. From Menard's perspective, it gave value to the person who paid regardless of what different corporate hats that person may have been wearing. I80 paid for the goods through its agent; Menard gave that person the goods. It does not matter if, unbeknownst to Menard, the agent changed hats after paying but before taking the goods. Section 548(c) looks at the transaction from Menard's perspective, not I80's.

### 2. Treating a Jones entity as I80's designee properly allocates monitoring costs.

Creditors of a corporate debtor are in a better position to monitor the debtor than are "auto dealers and the many others with whom the firm's transferees may deal." *Bonded*, 838 F.2d at 892. The Ninth Circuit B.A.P. put it well:

> Logic and equity require that ordinary market-price sales by retail merchants acting in good faith not be contorted beyond commercial practice for the purpose of expanding the merchant's status as a captive

12

> risk taker. … [S]ales made under ordinary commercial terms should be viewed as transactions between merchant and customer.

*Cohen*, 199 B.R. at 715. Merchants may adopt policies to control the level of risk they take in selling goods. Credit cards are attractive to merchants because they offer quick, guaranteed payment, thus saving them the trouble and risk of extending credit to customers. *Ohio v. Am. Express Co.*, 585 U.S. 529, 534 (2018). Should a customer fraudulently use a credit card, the merchant and issuing bank will separately distribute the loss according to their contractual agreement. Randy Gainer, *Allocating the Risk of Loss for Bank Card Fraud on the Internet*, 15 John Marshall J. Computer & Info. L. 39, 46–48 (Fall 1996). Those carefully crafted arrangements balance the risk of fraud with the economic efficiencies of quick payments. See generally James Cooper & Todd Zywicki, *A Chip off the Old Block or a New Direction for Payment Card Security? The Law and Economics of the U.S. Transition to EMV*, 2018 Mich. St. L. Rev. 869 (describing basic economic tradeoff between security and reducing payment friction). Courts should not treat merchants as if they had extended credit (and thus risked nonpayment) if they have specifically chosen to insist upon present payment with the customer before them. Menard did not, "like a mere general creditor, trust[] to the personal responsibility of the debtor," but instead gave value for money that the purchaser was apparently authorized to spend. See 1 Glenn, *supra*, §235.

Fraudulent conveyance law "is not designed to turn every vendor into an insurer to creditors against corporate malfeasance." *Mack Industries*, 622 B.R. at 895. It is difficult, in any case, to discern how Menard (or any similar merchant) could protect itself if the Trustee's theory is sound. No economically rational merchant would introduce the inefficiencies at the cash register needed to suss out that Bohannon was (1) authorized to use I80's credit card, (2) paid for the goods on behalf of I80, but (3) bought the goods on behalf of JL. The rational merchant would simply pass on the costs of the occasional total loss to the general public. That is not the point of fraudulent conveyance doctrine. *Bonded*, 838 F.2d at 893. Creditors are not entitled to a public bailout; they are entitled to recover gratuitous transfers of property. The Jones entities received gratuities, not Menard.

The banks, as creditors, were in a better position than Menard to monitor I80. The Trustee observes that I80 paid for goods at Menards only because I80 had two credit cards with large credit limits, and the Jones entities did not. Precisely. I80's creditors extended generous credit based upon their perception of I80's creditworthiness. Each time an agent of I80 presented I80's card to pay for goods at Menards, the bank authorized an instant loan to I80 to complete the transaction. Doc. #165 at 4–5. The banks were no doubt victims of I80's fraud—I80 was using the loans

13

not to purchase goods for I80's business but to transfer value to separate companies—but the banks knowingly took on and accounted for that risk when extending credit. Cf. *Illinois Bankers Ass'n v. Raoul*, No. 24 C 7307, 2024 WL 5186840, at **1–2 (N.D. Ill. Dec. 20, 2024) (describing interchange fees). The same is true of I80's other creditors. Fraudulent conveyance doctrine protects them to the extent that the Trustee may recover I80's gratuitous transfer of value to the Jones entities. But between the creditors and vendors like Menard, the creditors were in a superior position to evaluate and monitor I80. To the extent that §548(c) should be interpreted to efficiently allocate monitoring costs, see *Bonded*, 838 F.2d at 892–93, 897, Menard's interests prevail over the creditors'.

### 3. I80 gave funds to a merchant in exchange for goods; it did not gratuitously give money to creditors of the Jones entities.

That Menard was not a creditor is significant. Our case must be distinguished from the case of a debtor who gratuitously pays the already existing debt of another. Consider one last scenario:

> *Scenario 4.* John takes a ceiling fan to the cash register. The cashier has John sign a credit slip in which he promises to pay Menard $100 within 30 days. John walks out the door with a fan and a $100 debt. Ian then sends Menard $100 the next week with a note saying, "use this money to pay off John's loan."

We now have two transactions, not one. The first transaction, between John and Menard, may not be avoided because it did not involve an interest of Ian (the debtor) in property. §548(a)(1). The second transaction, between Ian and Menard, may be avoided. Menard did not give Ian any value in exchange for his $100—he was not obligated to pay John's debt—so the trustee may recover from Menard. §550(a)(1); cf. *In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997). The trustee may also recover from John (subject to the single-satisfaction rule, §550(d)), because the $100 payment was made for his benefit. §550(a)(1). See *Bonded*, 838 F.2d at 892.

Scenario 4 is one reason why the words "to the debtor" appear in §548(c). From Menard's perspective, it did not give any new value to Ian in exchange for his $100, so it should be liable under general principles of fraudulent conveyance law. To restore the state of affairs that existed before Ian's transfer, Ian's estate should get the $100 back, and Menard and John's credit relationship, in which John owes Menard $100, should be restored. Unlike in Scenario 3, no one is in a worse position when the trustee recovers from Menard and/or John in Scenario 4.

14

The Trustee argues that the facts of this case fall under Scenario 4. By her theory, which relies on Article 2 of the Uniform Commercial Code as adopted in Illinois and Iowa, a Jones entity was the "buyer" of goods. UCC §2-103(1)[2]. It was thus obligated to accept the goods and pay. UCC §2-301. The Jones entity accepted the goods and delegated the duty to pay to I80. UCC §2-210(1). I80 performed that duty as a Jones entity's delegate. *Id*. Title to the goods therefore passed directly from Menard to a Jones entity, the buyer. UCC §2-401(2).

The Trustee further asserts that a contract existed between the buyer and Menard even before I80 paid for the goods. She cites *Fender v. Colonial Stores, Inc.*, 225 S.E2d 691, 693 (Ga. Ct. App. 1976), for the proposition that a retail contract is formed when a customer takes an item off the shelf with the intent to pay for it. At that moment in time, then, the Jones entity incurred an obligation, and I80's later payment of that obligation (at the cash register) was gratuitous, as in Scenario 4.

Two problems undermine the Trustee's theory. First, *Fender* is an interpretation of Georgia law that does not control these purchases. Under Illinois law, there is a contract—meaning an accepted offer to purchase with consideration—"[o]nly when the merchant takes the money." *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 639 (Ill. 1977). For any transaction in Illinois, at least, the Jones entity did not incur an obligation before I80 paid for the goods.

The bigger problem with the Trustee's theory is that it focuses on the wrong authority. Indeed, both parties insist that provisions of state law—in particular, Article 2 of the UCC—control the outcome. That is incorrect. The Court previously noted:

> As a federal statute, the provisions of the Bankruptcy Code are interpreted as a matter of federal law. While state statutes may play an important role in determining a debtor's property rights and liabilities, applying the Bankruptcy Code to those rights and obligations is ultimately a question of federal law. *In re Groetken*, 843 F.2d 1007, 1013 (7th Cir. 1988).

Doc. #28 at 3. The phrase "value to the debtor" in §548(c) is construed as a matter of federal law. Cf. *Warsco v. Creditmax Collection Agency, Inc.*, 56 F.4th 1134, 1136 (7th Cir. 2023). Federal law looks to the substance of a transfer, not the form. *Boyer*, 587 F.3d at 793. Section 548(c) does not make dispositive who as a matter of state law received title,

---

[2] Illinois' and Iowa's versions of the UCC do not appear to differ from the Official Version for our purposes, so this opinion uses the regular numbering system. For example, UCC §2-103 corresponds to 810 ILCS 5/2-103 and Iowa Code 554.2103.

or when title passed, or who retained possession, or any of the other factual questions the parties debate. It asks, from the transferee's perspective, whether the transferee gave value to the debtor. Menard gave value to whomever the Debtor designated (or to whomever the Debtor acquiesced in receiving the goods). That constitutes value to the debtor as a matter of federal law, regardless of whether the parties were in Illinois[3] or Georgia[4] (or Florida[5], or California[6], or any other state).

Fraudulent conveyance law distinguishes between (1) an arm's-length purchase of new, equivalent-value goods that is completed in one transaction and (2) a gratuitous payment of an antecedent third-party debt. I80's transfers consisted of the former. Menard was not a creditor, even if Article 2 could be read on these facts to say that the Jones entities incurred an obligation to pay before getting to the cash register. Menard insisted on contemporaneous payment before permitting a customer to take its merchandise out of the store. No transfer of I80's money to Menard was gratuitous. Menard never got something for nothing.

The Trustee suggested at oral argument that Menard would have the right to pursue the Jones entities if it were forced to return I80's money. Making Menard a creditor of the Jones entities would not restore the status quo ante, though. Menard was unwilling to (and did not) sell goods on credit. The point of fraudulent conveyance law is to set things as they were, not to put any party in a worse position. The Trustee's theory is untenable as a matter of federal law. For purposes of §548(c), Menard gave value to I80 even if the goods were received by I80's designee.

### 4. Alternatively, the Court recharacterizes each sales transaction as encompassing two separate transfers.

Achieving the purposes served by the fraudulent transfer provisions in the Bankruptcy Code requires focusing on the transfer that was fraudulent, not any incidental transfers along the way. *Merit Management Group, LP v. FTI Consulting, Inc.*, 583 U.S. 366, 369–70 (2018). That an intermediary touched the transferred property (usually, funds) does not impose liability unless the intermediary obtains some degree of control over the disposition of those funds. *Bonded*, 838 F.2d at 894. In other words, a "mere conduit" is not an initial transferee. *In re Custom Contractors, LLC*, 745 F.3d 1342,

---

[3] *Mack Industries*, 622 B.R. at 895.
[4] *Think Retail Solutions*, 2019 WL 2912717, at **20–21.
[5] *Phoenix Diversified Inv. Corp.*, 2011 WL 2182881, at **5–6.
[6] *Cohen*, 199 B.R. at 715.

1349–50 (11th Cir. 2014). A recipient of funds who exercises no dominion over those funds has not received a gratuity that may be recovered by the trustee.

This is not a conduit case, but it resembles one. In exchange for I80's payments, Menard delivered merchandise of equivalent value to the Jones entities. The transfer of value flowed through Menard, but Menard did not materially alter the amount of the value. The fraudulent transfer of value was from I80 to the Jones entities, and that is what should be reversed under *Bonded* and *Merit Management*. The difference, of course, is that Menard received money from I80 but gave goods to the Jones entities. That should not practically distinguish Menard from a conduit, because Menard merely replaced one asset with another of equivalent value. See *Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir. 1995). But as the Court previously held, Menard was entitled to do whatever it wanted with the money it received from I80 (Doc. #107), so it was the initial transferee of the funds Menard borrowed through its credit card (Doc. #165). That it was required by the terms of the transactions to transfer and deliver goods in exchange for the money, UCC §2-301, does not make Menard a conduit.

The fact remains, though, that I80 used Menard to transform I80's money into goods belonging to the Jones entities. One way to reflect that substantive reality is to "unpack" the single transaction at the cash register into two separate transfers by the debtor in what might be thought of as the inverse of "collapsing" multiple transactions into one. See Rasmussen, *supra,* 52 U. Chi. L.R. at 205 & n.41; compare with *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995). In the paradigmatic "collapsing" scheme

> one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.

*HBE Leasing Corp.*, 48 F.3d at 635. The initial transfer in such a scheme appears to be an equivalent value exchange that would not be avoidable as fraudulent, but the transfer may be avoided nonetheless as part and parcel of a fraudulent transfer if the initial transferee knowingly helped to facilitate the asset-depleting scheme (that is, it lacked good faith). *Id.* at 635–37. A money launderer is liable for knowingly helping an insolvent unfairly dissipate its money.

Here we have the inverse: we must unpack one transaction, instead of collapsing multiple transactions. They are two sides of the same coin, though. Collapsing multiple transactions is an offensive use of recharacterizing a transaction, whereas unpacking

one transaction is a defensive use of the same. Brubaker, *supra*. In both cases, the formal transaction structure may be disregarded consistent with "the legitimate equitable powers that bankruptcy courts exercise." *Id*., citing *Pepper v. Litton*, 308 U.S. 295, 304–05 (1939); accord *Boyer*, 587 F.3d at 793 (elevating substance above form).

Viewing the retail sales at Menards to involve two transfers of the debtor would conform the transactions to Scenario 1, above. I80 bought goods that it then gave to the Jones entities. Unless Menard acted in bad faith (that is, it knowingly participated in laundering I80's funds by converting them into goods for the Jones entities), it is not liable to disgorge I80's payments because it gave value to I80. I80's transfer of goods to the Jones entities was a separate, avoidable transfer. Because Menard undisputedly acted in good faith, it is not liable. §548(c).

## IV. Conclusion

It is better to treat a single sales transaction as a single sales transaction. As a matter of statutory interpretation, a retail merchant gives value to the debtor when it delivers goods to the debtor's designee in exchange for contemporaneous payment from the debtor at the cash register. But should that interpretation of §548(c) not withstand further scrutiny, the Court would exercise its equitable power to recharacterize each transaction at the cash register to encompass two separate transfers by the debtor. Substance, not form, controls.

Under either framework, Menard gave value to the Debtor in each of the transfers alleged in the Complaint. Menard's renewed motion for summary judgment (Doc. #155) is therefore GRANTED and judgment shall be entered in favor of Menard. The Trustee's cross-motion for partial summary judgment (Doc. #176) is DENIED. Any other pending motion is DENIED as moot. A separate judgment shall issue.

# # #